**Mihail Daniel ILEANA, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE; John Ashcroft, Attorney General, Respondents.**

No. 02–3972.

United States Court of Appeals, Sixth Circuit.

Aug. 5, 2004.

Richard T. Herman, Cleveland, OH, for Petitioner.

William C. Minick, Linda S. Wernery, U.S. Department of Justice, Office of Immigration Litigation, Washington, DC, for Respondents.

Before COLE and COOK, Circuit Judges; and SPIEGEL, Senior District Judge.[*]

SPIEGEL, Senior District Judge.

Mihail Ileana appeals the decision of the Board of Immigration Appeals upholding an immigration judge's denial of Ileana's application for asylum, withholding of deportation, and voluntary departure. Ileana argues that the immigration judge: (1) violated his due process rights in permitting his counsel to withdraw; (2) insufficiently supported her adverse credibility determinations, and (3) lacked sufficient basis for concluding that he neither suffered past persecution nor had a well-founded belief in future persecution. He also claims that his pro se representation at the evidentiary hearing was so ineffective as to make the hearing fundamentally unfair. We reverse and remand for further consideration, in accordance with this opinion.

Ileana, a Romanian citizen, entered the United States in 1994 as a nonimmigrant visitor. Shortly thereafter, he submitted a self-prepared I–589 Application for Asylum and Withholding of Removal. The INS denied this application and placed

[*] The Honorable S. Arthur Spiegel, United States District Judge for the Southern District of Ohio, sitting by designation.

Ileana in deportation proceedings. In 1996, he submitted a new I–589 application that his attorney, Svetlana Schreiber, prepared.

In late January 1998, the Immigration Judge (IJ) held a final master calendar hearing at which she scheduled an evidentiary hearing for April 23, 1998. At the same time, Schreiber informed the IJ that she intended to move for permission to withdraw as Ileana's counsel. Ileana confirmed that he no longer wanted Schreiber to represent him, and the IJ signaled her intention to grant Schreiber's motion upon its being filed. Schreiber also requested a continuance of the hearing date to give Ileana time to find new counsel. In response, the IJ predicted that Ileana would be unable to obtain a work authorization for the period of time that the hearing would be delayed and that prediction prompted Schreiber to consent to the April 23rd hearing date.

In February 1998, Schreiber filed her motion to withdraw representation. The IJ granted the motion on, or sometime prior to, April 15, 1998, when she sent Ileana a letter confirming the April 23rd hearing date.

Ileana appeared pro se at the scheduled April 23rd hearing, arguing that because family members were practicing Baptists, and because of his political statements and activities, he suffered persecution in Romania under the Ceausescu regime and would be subject to future persecution if he returned. The IJ denied Ileana's application for asylum, withholding of departure, and voluntary departure, finding that Ileana was not a credible witness and that he failed to establish either past persecution or a well-founded fear of future persecution. The Board of Immigration Appeals (BIA) affirmed the IJ's findings.

This court must uphold the BIA's decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992) (internal quotation marks omitted). Substantial evidence is a "deferential standard which plainly does not entitle a reviewing court to reverse ... simply because it is convinced that it would have decided the case differently." *Klawitter v. INS,* 970 F.2d 149, 151–52 (6th Cir.1992) (citation and internal quotation marks omitted). "Rather, in order to reverse the BIA's factual determinations, the reviewing court must find that the evidence not only supports a contrary conclusion, but indeed *compels* it." *Id.* at 152 (citing *Elias–Zacarias,* 502 U.S. at 481, n. 1, 112 S.Ct. 812).

### A. Past Persecution

Ileana claims that the IJ did not adequately support her adverse credibility determination pertaining to past persecution. The IJ based her adverse credibility determination primarily upon 1) the fact that his two applications for asylum mention different examples of persecution, and 2) that Ileana's responses to queries of government counsel and the court were "delayed and rambling." Ileana argues that IJ's are capable of making mistakes in credibility determinations, and that he was not intentionally unresponsive to questions or evasive, but rather he did not understand the questions. Ileana cites to *Aguilera–Cota v. U.S. INS,* 914 F.2d 1375, 1381 (9th Cir.1990), noting the reversal of an IJ's determination that an asylum applicant lacked credibility because his application did not refer to incidents given in his testimony.

The Court will not accept blindly an IJ's conclusion that a petitioner is not credible. Rather, we examine the record to see whether substantial evidence supports that conclusion, and determine whether the

reasoning employed by the IJ is fatally flawed. In this instance, with the assistance of counsel, Ileana listed the following in his 1996 affidavit: (1) his paternal grandfather was arrested as a result of his religious practice and died in prison after being tortured; (2) his father was placed under constant surveillance, and was randomly arrested and detained; (3) his uncle was persecuted due to his Baptist faith, and was eventually granted political asylum in the U.S., which led the government to once again place his family under surveillance; (4) after being drafted into the army, he was interrogated about his uncle (who fled to the US) and assigned to spend his entire military term doing sewer maintenance, in which "[t]he risk of being injured or accidentally shot was very high"; (5) after being released from the military, he was placed under surveillance; (6) he attempted to escape Romania in 1989, was caught, imprisoned, and severely beaten; (7) an unidentified official came to his door in 1990, questioned his mother about his desires to leave Romania, and hit his mother several times, leading to her hospitalization; (8) he was detained by the police for several days in 1993, and was repeatedly beaten, requiring his hospitalization; and (9) he was subsequently arrested and threatened with false rape charges.

None of these submissions are internally inconsistent or otherwise implausible. The IJ's main reason for disbelieving them was that many of them were absent from Ileana's initial asylum application, which he filled out in 1994. However, this application was prepared without counsel, and probably without a translator. Put simply, "[f]orms are frequently filled out by poor, illiterate people who do not speak English and are unable to retain counsel. Under these circumstances, the IJs cannot expect the answers provided in the applications to be as comprehensive or as thorough as they would be if set forth in a legal brief." *Aguilera–Cota v. INS*, 914 F.2d 1375, 1382 (9th Cir.1990).

Moreover, the application that Ileana filled out in 1994 does not lend itself to a comprehensive accounting of detail after detail. As the Second Circuit explains: "the circumstances surrounding the application process do not often lend themselves to a perfectly complete and comprehensive recitation of an applicant's claim to asylum or withholding, and that holding applicants to such a standard is not only unrealistic but also unfair." *Secaida–Rosales v. INS*, 331 F.3d 297, 308 (2d Cir. 2003). Specifically, "the form utilized by the INS for applications for asylum and withholding provides half a page for the applicant to explain why he or she is seeking asylum, and no more than two inches to recount mistreatment or threats against the applicant or the applicant's family by the government or other groups. Although the application invites the applicant to attach additional pages, we think the small space on the form itself would hardly indicate to an applicant that the failure to include every detail regarding the basis for asylum could later lead to an adverse credibility finding when the applicant elaborates on them in the course of a deportation hearing." *Id.* at 308. In sum, limited space provided by the initial application, along with the fact that Ileana prepared it on his own, makes the mere omission of some of these incidents not only insignificant, but expected.

Indeed, when asked why he omitted the demonstrations from his initial 1994 application, Ileana explained—quite plausibly—that "I didn't know that this will count for my case." *Id.* at 309 (holding that the IJ held petitioner to an "inappropriately exacting standard" in discounting his explanation that "he had been scared and flustered by his recent arrest and impending

deportation proceedings, and had probably simply forgotten to tell his non-attorney representative all the details of his experiences in Guatemala.") Given that "the immigration laws have been termed second only to the Internal Revenue Code in complexity," *Castro–O'Ryan v. INS*, 847 F.2d 1307, 1312 (9th Cir.1987) (internal quotations omitted), "applicants for asylum ... may not possess the legal knowledge to fully appreciate which facts are relevant." *Jacinto v. INS*, 208 F.3d 725, 733 (9th Cir.2000).

The IJ's purported finding of affirmative inconsistencies is also dubious. First, the IJ asserted that Ileana gave inconsistent testimony regarding his role in a demonstration: "On questioning [Ileana] states that it was a spontaneously [sic] demonstration when workers and others came out and walked to the city hall. In his affidavit ..., [Ileana] asserts that he organized the demonstration in Arad." (J.A.39) Note, however, that Ileana's affidavit mentions two demonstrations: the first one in Arad that he organized, and a second one in Timishoara in which he merely participated. (J.A. 136–37) Yet right before giving the culprit answer, Ileana spoke of demonstrations "[i]n my city which is Arad and then Timishorara." (J.A.93) The IJ did not ask Ileana if he was confusing the two demonstrations, however, or otherwise seek clarification. And in a recent immigration case, we vacated the deportation order when "[i]nstead of attempting to reconcile the discrepancies, the [IJ] simply, and unjustifiably, assumed that there was an inconsistency between the two testimonies." *Daneshvar v. Ashcroft*, 355 F.3d 615, 623 n. 8 (6th Cir.2004).

Second, the IJ appeared to label as "contradictory" two separate incidents of police beatings. The following exchange took place at the hearing:

Q: You now say that in 1993 ... Sergeant Moruro and Lieutenant Sandru, took you to the police station and they hit you with a gun, because you spoke badly about *Securitate*. Is that the truth?

A: Yes.

Q: Sir, can you tell me why in your application for asylum in 1994, you said that Sergeant Moruru and Lieutenant Sandru came to your house in July of 1989, and that they took you in 1989 to the police station and they questioned you about being in demonstrations then. And that they accused you of being against the Communist party and the Ceausescu regime? And they hit you across the back of your legs with a baton?

A: Because they had on file people that wanted to leave the country and talking badly.

Q: Well which was it, did they beat you in the face with a gun in '93 or did they hit you across the back of the legs with a baton in '89?

A: Both incidents are true.

(J.A. 99) There appears to be no contradiction. Ileana said that both incidents happened, and the only evidence of any contradiction is that he left one off his initial application (which for the reasons detailed above, hardly demonstrates inconsistency). Moreover, although "refugees rarely are able to offer direct corroboration of specific threats," *Aguilera–Cota*, 914 F.2d at 1379 (internal quotations omitted), Ileana produced a doctor's certificate detailing his injuries from the 1993 incident. (J.A. 141–42) The BIA deemed this evidence "unauthenticated," (J.A.5) but of course the rules of evidence do not apply in IJ hearings. *See, e.g., Niam v. Ashcroft*, 354 F.3d 652, 659 (7th Cir.2004) (Posner, J.) (noting, when reviewing an IJ

354

hearing, that "administrative agencies are not bound by the hearsay rule or any other of the conventional rules of evidence, but only by the looser standard of due process of law").

The IJ also inquired "why is it that these gentlemen would accuse you of being against the Communist party in 1989, when your own application that you swore was true, not more than an hour ago says you were dues paying member of the Communist party up until 1990." As Ileana answered—quite logically—"I wasn't active in the Communist party ... I was just made to join the party when I was working for the railroad in Arad." (J.A.45) Indeed, if simply paying dues to the Communists gave everyone in Romania a free ride to say whatever they wanted, there would not have been any persecution at all. *See Dia v. Ashcroft,* 353 F.3d 228, 254 (3d Cir.2003) (en banc) ("The other reasons that the IJ proffered for rejecting this testimony are similarly based on unsustainable grounds, namely, pure conjecture."). That the IJ attempted to catch Ileana in a lie on this point raises questions about her understanding of the political realities in Romania. *See Osorio v. INS,* 18 F.3d 1017, 1030 (2d Cir.1994) ("The BIA's decision thus reveals a complete lack of understanding of the political dynamics in Guatemala."); *Osmani v. INS,* 14 F.3d 13, 14 (7th Cir. 1994) ("[T]he Board seems unaware of the elementary facts of contemporary history, even those that bear vitally on its mission.").

■ Finally, the IJ's catch-all argument—that Ileana's responses to her questions were "delayed and rambling"—hardly suggests that Ileana lacked credibility. "[M]ost witnesses, particularly uneducated, non-English speakers seeking asylum, are uncomfortable and nervous when being cross-examined and, perhaps, when being questioned by a judge." *Arulampalam v.*

*Ashcroft,* 353 F.3d 679, 682 (9th Cir.2003). This nervousness must also be evaluated in light of Ileana's lack of counsel during the hearing; without a professional guiding him through the process, his confusion and anxiety would only have been heightened.

In sum, Ileana provided numerous instances of persecution with few contradictions. The IJ's conclusions with respect to the few contradictions are generally not supported by substantial evidence in the record. We therefore reverse the IJ's findings with respect to Ileana's past persecution.

### B. Future Persecution

■ Ileana asserts that the BIA erred in upholding the IJ's finding of insufficient evidence of either past persecution or a well-founded belief in future persecution. The record demonstrates the IJ based her conclusion on both her credibility assessment of Ileana as well as governmental reports belying Ileana's claims regarding the prospect of future persecution in Romania. At the hearing, Ileana, acting pro se, offered no additional evidence—beyond that which was already in his asylum application—to contradict the government's reports of improved conditions in Romania. Instead, he asked the court take judicial notice of an excerpt from a 2003 State Department report on human rights conditions in Romania. (Appellant's Br. at 31–32.) This court limits its review of any petition for asylum to the administrative record the BIA considered. 8 U.S.C. § 1105a(a)(4) (repealed); 8 U.S.C. § 1252(b)(4)(A).

Ileana testified that he would be persecuted upon his return by the local authorities and the secret police (the latter was known during the Communist-era as the *Securitate*). When confronted with the fact that the Romanian government changed in 1997, Ileana responded "[t]he

government may be new but *Securitate* is the same the police is the same, only the names have changed." (J.A.91) The IJ responded by stating that "I have information from the Department of State that says that the new police are not as numerous or as many and that they do not arbitrarily arrest and detain people." The Court notes, however, that the Department of State report referred to by the IJ stated (in its introduction) that in 1997, "several serious problems remained. Police continued to beat detainees. The Government investigated police officers suspected of abuse ... [h]owever, investigations of police abuses are generally lengthy and indeterminate, and rarely result in prosecutions or punishments." (J.A. 110) The report continues by noting several instances of death at the hands of the police, and explains that "[i]n several earlier cases of deaths in custody or deaths reportedly due to police brutality, investigations and trials are still dragging on, years later." (J.A. 110) Furthermore, posits the Department of State report upon which the IJ relied, "the United Nations Special Rapporteur on Torture and other Cruel, Inhuman, or Degrading Treatment or Punishment reported that he had received allegations of torture and mistreatment during detention, usually at police stations. Police officers allegedly *often* used force during interrogations to obtain confessions." (emphasis added)

The Department of State report also addresses the issue of surveillances and intrusions in homes—which Ileana complained about in his affidavit. As the Department of State report explains, "[s]ecurity officials may enter residences without proper authorization from a prosecutor if they deem a threat to national security to be 'imminent.'" And "although the law requires the [security service] to obtain a warrant from a prosecutor to carry out intelligence activities involving 'threats to

national security,' it may engage in a wide variety of operations, including 'technical operations,' to determine if a situation meets the legal definition of a threat to national security." (J.A.112) As for the right to engage in political expression, the Department of State report explains that citizens may suffer criminal penalties for "defamation of the country." (J.A.112) Similarly, "[t]he law forbids public gatherings to espouse Communist, racist, or Fascist ideologies, or to commit actions *contrary to public order or national security.*" (emphasis added) And Romania "punishes unauthorized demonstrations or other violations by imprisonment and fines." (J.A. 113)

In their written decisions, neither the IJ nor the BIA explicitly addressed this evidence—even though it was in the very report on which they relied. Other courts have reversed the BIA for failing to take note of this type of evidence present in country reports—including reports specific to Romania. For instance, in *Gui v. INS*, 280 F.3d 1217, 1229 (9th Cir.2002), the Ninth Circuit noted that "[t]he INS points only to a February 1995 Department of State Country Report on Romania. That report—now seven years old—noted that 'police continue to use excessive force during arrest and to beat detainees.'" *Cf. Mansour v. INS*, 230 F.3d 902, 907–08 (7th Cir.2000) (vacating due to BIA's "silence with regard to the U.S. Department of State's Report (1998) that suggests that the Iraqi government has engaged in abuses against the Assyrian Christians").

Similarly, the IJ and BIA failed to address or even mention any of the documentary evidence submitted by Ileana with his 1996 application. This evidence provided corroborated his assertions that the new security service (known as the "SRI") is not necessarily any better than the old one. Ileana submitted a report from the

Commission on Security and Cooperation in Europe—a joint project of the Executive and Legislative branch—which stated that although "[t]he official explanation given for [the SRI's] creation was that Romania needed a strong intelligence network to protect the country from foreign provocateurs who were responsible for staging the bloody riots in an attempt to weaken Romania[,] ... the opposition insisted that the authorities themselves had helped provoke the events ... to provide a justification for resurrecting the *Securitate* under another name." (J.A.205) The report further notes that even the head of the SRI—himself accused of having been a high-ranking official in the *Securitate*— "was unclear about how many members of the *Securitate* were now employed by his agency, or what had happened to those who were retired ... [and] he stated that some 5,000 *Securitate* agents had been taken on by the SRI." (J.A.206) Ileana also submitted a letter from David Funderburk, Ph.D., the former U.S. Ambassador to Romania and an expert in Romanian politics, which stated that "[t]he secret police uses no discernible logic in its operations and persecutions. Political and religious persecution in 1993 have not been eliminated and the secret police files are still intact. These files are not open to the public but the [security service] has access to them."

This is not to say that the IJ and the BIA necessarily had to defer to Ileana's evidence. But their upbeat assessments of the state of the government, politics, and the former secret police in Romania appear to lack substantial support given the contrary evidence Ileana submitted that the IJ and the BIA failed to acknowledge explicitly. *See Vujisic v. INS*, 224 F.3d at 581 (vacating when "[i]t appears from the Board's order that it ignored [certain] evidence"). And this contrary evidence is certainly consistent with the findings of other courts who have evaluated asylum requests by citizens of Romania and other countries in the region. *See Hengan v. INS*, 79 F.3d 60, 62 (7th Cir. 1996) (vacating the BIA's decision denying relief to a Romania immigrant, noting that "[petitioner] does not argue that the national government of Romania persecutes Hungarians; instead she contends that the national government is unwilling or unable to control local persecutors, such as Mayor Funar, his police, and his supporters"); *Marcu v. INS*, 147 F.3d 1078, 1088–89 (9th Cir.1998) (Hawkins, J., dissenting) ("[W]hile the changes on the national level in Romania have been fundamental, local governments are unchanged. It was local police who primarily tormented his family for 45 years. The State Department's report simply does not rebut the presumption that [the petitioner] has a well-founded fear of persecution from local authorities."); *Borca v. INS*, 77 F.3d 210, 217 (7th Cir.1996) (noting "evolving nature of the Romanian political scene"). *Cf. Niam v. Ashcroft*, 354 F.3d at 657 ("[T]here is evidence that Bulgaria's former communist bigwigs, quickly recycled as socialists and now busy cosying up to the United States, retain significant power in Bulgaria, especially and quite relevantly over the security service, and continue to pursue the old vendettas against anticommunists....").

Instead of addressing this evidence, the IJ told Ileana that "I have information from the Department of State that says that the *Securitate* no longer exist and the files of *Securitate* have been sealed for forty years .... [w]hat information do you have that contradicts that?" When Ileana did not answer, the IJ "[l]et the record reflect that there's been a lengthy pause," and the IJ pointed to that pause in her credibility determinations. Again, however, this pause followed the IJ's assertions to Ileana about the state of Romania that

contradicted not only Ileana's evidence but also the Department of State Report that the IJ was relying on. It is not inconceivable that Ileana, acting without counsel at the hearing, was at a loss in how to respond to the IJ, who ignored all the evidence he submitted in support of his position. This could be an instance where Ileana "was clearly nonplused by this point and could not be expected to know what evidence was essential to making his claim." *Colmenar v. INS,* 210 F.3d 967, 972 (9th Cir.2000).

Finally, the IJ missed the point when she concluded that Ileana was misleading her about whether leaving the country is a crime for which he would be punished. It is not entirely clear, first of all, whether Ileana actually stated that leaving the country is a crime. He answered "yes," to the question "It's not a crime to leave Romania is it?"—he could very well have meant, yes, you are correct. (J.A.89) Indeed, even after Ileana answered, the IJ told him "you don't understand my question." (J.A.89) In any event, Ileana's testimony was clearly not trying to make a point about formal legislative enactments; rather, he was testifying that the local police would punish him because he left the country—regardless of law formally on the books. That the national Romanian government did not formally enact a law prohibiting individuals from leaving the country did not mean that local officials—who Ileana claimed were sympathetic to the former Communist government—would not punish him for doing so. And "[w]hen an IJ bases her conclusion on an erroneous interpretation of the testimonial and documentary evidence in the record, it undoubtedly is not supported by substantial evidence." *Dia,* 353 F.3d at 260.

The failure to grapple with the contrary evidence in the record is further compounded by the fact that *four years* passed from the time that the IJ issued her decision and the time that the BIA affirmed it. "Only heaven knows why the case languished for so long in the BIA, during which time Popp's connections with the United States could only have strengthened and his ties to Romania could only have been more attenuated. But it can fairly be said that the record before us sheds absolutely no light on current country conditions in Romania that one might think relevant to an asylum claim." *See Popp v. INS,* 41 Fed.Appx. 146, 147 (9th Cir.2002) (Gould, J., concurring).

No doubt, Romania has improved since its officially Communist days. But "[t]he fact that such abuses may not have been widespread or may not have formed a clear pattern does not mean that particular individuals who have been targeted in the past are safe." *Lal v. INS,* 255 F.3d 998, 1011 (9th Cir.2001). In this case, Ileana asserted specific abuses by local police and security services, and the IJ and BIA's invocation of only general country conditions does not really address Ileana's claims. This is not to say that they got it wrong, but their failure to grapple with the evidence on the other side—that notwithstanding broad improvements, local abuses by police remain—suggests that the decision must be sent back for a more complete analysis. Given the time that has passed, the IJ should afford both the government and Ileana a reasonable opportunity to submit additional evidence regarding Romania's current conditions.

Thus, the BIA's judgment should be VACATED and the case REMANDED for further consideration. Because we vacate the removal order on other grounds, we need not decide whether Ileana's Sixth Amendment right to counsel was violated in his previous hearing before the IJ.