NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0183n.06

No. 08-4447

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

JEAN REYNOLD ALCIUS,                        )
                                            )       ON APPEAL FROM THE
        *Petitioner*,                       )       BOARD OF IMMIGRATION
                                            )       APPEALS
v.                                          )
                                            )            **O P I N I O N**
ERIC H. HOLDER, JR.**, Attorney General,    )
                                            )
        *Respondent*.                       )

BEFORE:     MARTIN, BOGGS, and COLE, Circuit Judges.

**COLE, Circuit Judge.** Jean Reynold Alcius petitions for review of a decision by the Board

of Immigration Appeals affirming an immigration judge's denial of his application for asylum,

withholding of removal, and relief under the Convention Against Torture. For the following reasons,

we **GRANT** the petition for review, **VACATE** the Board of Immigration Appeals's decision, and

**REMAND**.

## I.  BACKGROUND

### A.  Factual Background

Alcius's application for relief centers on his political activities in Haiti during the early 1990s

and the alleged murder of his grandfather in 2004 that Alcius claims was politically motivated.

Alcius, a native and citizen of Haiti, was raised by his paternal grandfather from the age of seven.

Alcius's grandfather began working as a political activist affiliated with Jean-Bertrand Aristide and

Aristide's Fanmi Lavalas party ("FL" or "Lavalas") in the 1980s and involved Alcius in his political activities while Alcius was still a child. Aristide was elected President in 1990, but was forced out of power by a military coup the following year. While Aristide was in exile from 1991 to 1994, Alcius and his grandfather were harassed regularly by soldiers, police, and right-wing paramilitary groups. Most dramatically, in March 1994, police and military guards affiliated with the paramilitary group Front for the Advancement and Progress of Haiti ("FRAPH") arrested Alcius and his grandfather. They were detained, interrogated, and beaten at a Port-au-Prince prison for two days. During their detention, Alcius was shot in the leg and suffered a broken finger after being struck by the butt of a guard's rifle. Upon their release, Alcius and his grandfather went into hiding in Port-au-Prince for several months. When the politically charged atmosphere subsided, they returned to their home in the city of Gonaïves. Aristide returned from exile and was reinstated as president later that year.

In December 1995, Alcius left Haiti for Panama to pursue his education. He lived in Panama for nearly eight years, obtaining a student visa and earning a degree in business. Following his graduation in 2003, Alcius took a temporary position working on a cruise ship that traveled throughout the Carribean. His employment ended on April 10, 2004, while his ship was docked in Miami, Florida. Before embarking back to Haiti, he attempted to reach his grandfather by phone, but there was no answer. Alcius then called one of his grandfather's neighbors, Gary Antoine, who told Alcius that his grandfather had been killed.

According to Alcius, Antoine told him that armed men from a paramilitary group consisting of former military personnel and FRAPH members came to his grandfather's house on the night of

February 23, 2004, and spoke to his grandfather. With the knowledge that his grandfather was at home, they returned later that night, doused the house in gasoline, and set it on fire, killing his grandfather. Prior to his murder, Alcius's grandfather increasingly had become a subject of harassment from anti-Aristide groups. Antoine told Alcius not to return to Haiti because his grandfather's killers had asked about him and would kill him if he returned. In fear of returning to Haiti, Alcius decided to stay in the United States.

Alcius's account of his grandfather's murder corresponds with larger political developments in Haiti at the time. In early 2004, a violent uprising against Aristide's regime was underway, with rebels seizing cities and towns. Days after the alleged murder, on February 29, 2004, anti-Aristide rebels gained control of the government and forced Aristide back into exile.

**B. Procedural Background**

This case comes to us with a tangled procedural history. Alcius submitted an affirmative application for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT") on December 6, 2004. On June 1, 2005, an immigration judge ("IJ") conducted a merits hearing in Alcius's case, where Alcius was the only testifying witness. Alcius submitted into evidence a photograph of a burnt house that he alleged was his grandfather's house and a letter from Antoine describing the incidents culminating in his grandfather's death.

The IJ rendered an oral decision in Alcius's case at the hearing. The IJ found Alcius to be credible and noted the findings of a U.S. State Department report, admitted into the record, that while some parts of Haiti were still controlled by Lavalas supporters, "the [Gonaïves] area where [Alcius's] grandfather was killed was subjected to a reign of terror by anti-Aristide forces in

February 2004 just as he stated and that [was] presumably when the grandfather was killed."

(Respondent's Appendix ("R. App'x") 224.) Although the IJ indicated that Alcius would have a

well-founded fear of future persecution if he returned to Gonaïves, where he was known and where

his grandfather was killed, he denied asylum and withholding of removal based on a finding that

Alcius could safely relocate to an area of the country still controlled by pro-Lavalas forces. The IJ

also denied him CAT relief.

Alcius's case took an unexpected turn when he appealed the IJ's decision to the Board of

Immigration Appeals ("BIA"). The BIA lost or never received the record in Alcius's case from the

immigration court. Unable to consider Alcius's case on its merits, the BIA remanded the case to the

immigration court either to recover the record or, if the record could not be recovered, carry out

further proceedings and enter a new decision. On remand, the immigration court was unable to

locate the file, and the IJ who presided over the initial hearing decided to hold a new merits hearing,

urging the parties to resubmit all the evidence and supporting documentation submitted at the initial

merits hearing.

The IJ held a new merits hearing on November 13, 2006. Alcius was represented by a new

attorney who had not attended the previous proceedings. Alcius was again the only witness to

testify, and both parties introduced documentary evidence concerning the political conditions in

Haiti. The letter and photograph from Antoine were not resubmitted into evidence, although the

Government did ask Alcius about Antoine's letter on cross-examination. After Alcius's testimony,

the IJ scheduled a continued hearing for December 12, 2006, for Alcius's counsel to make a closing

argument and for the IJ to issue an opinion. Prior to that hearing, the Government submitted a brief

arguing that Alcius's Lavalas-related activities constituted giving material support to a terrorist organization and attached a number of documents about the conditions in Haiti from 2000 to 2005. The IJ apparently was sympathetic to the Government's position but felt that its evidence was not on point temporally—"it occured [sic] to the Court that [the Government's] point was well-taken, but that the proferred [sic] evidence related to the period 2000-06, whereas [Alcius's] activities took place from 1991-94." (Petitioner's Appendix ("P. App'x") 31.) Thereupon, the IJ conducted independent internet research on Lavalas's activities and sua sponte submitted the materials into the record at the December 12, 2006, hearing. The IJ again continued the hearing to a later date to give Alcius an opportunity to respond to this evidence. In the interim, Alcius filed a motion to exclude this evidence.

On April 13, 2007, the IJ issued a written decision. First, the IJ excluded the evidence he had entered into the record sua sponte, noting that the admission of such evidence might raise due process concerns. Turning to the merits, the IJ again denied Alcius's application for asylum and withholding of removal, but this time on different grounds. Although the IJ found that Alcius generally was credible and that his 1994 detention constituted "past persecution" giving rise to a presumption that he had a current well-founded fear of persecution, the IJ determined that the Government had rebutted this presumption by showing that the military government in place in 1994 was not "remotely identifiable" with the current Haitian regime. (P. App'x 41.) The IJ concluded that Alcius had not overcome the Government's showing of changed country conditions because Alcius had not produced corroborating evidence regarding his grandfather's murder. Specifically, the IJ stated that "[a]n affidavit from the neighbors could have been obtained, but has not been.

[Alcius] has not carried his burden as to his claim that his grandfather was murdered for political reasons." (*Id.*) The IJ also denied Alcius CAT relief.

On appeal, the BIA affirmed the IJ's denial of asylum, withholding of removal, and CAT relief. In regards to asylum, the BIA stated that "[t]he record supports the finding that the presumption of a well-founded fear of persecution from the military government opposing the FL has been rebutted with evidence of a fundamental change in circumstances effected by the election of a new government." (P. App'x 5.) In regards to CAT relief, the BIA simply stated that it found no reason to disturb the IJ's determination that Alcius had not met his burden of proof.

Alcius timely petitioned this Court to review the BIA's decision, arguing that he was denied due process and was entitled to asylum, withholding of removal, and CAT relief. We have jurisdiction under 8 U.S.C. § 1252(a).

## II.  ANALYSIS

### A.  Standard of Review

"Where the BIA reviews the immigration judge's decision and issues a separate opinion, rather than summarily affirming the immigration judge's decision, we review the BIA's decision as the final agency determination. To the extent the BIA adopted the immigration judge's reasoning, however, this Court also reviews the immigration judge's decision." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009) (internal citation omitted). Where, as in this case, the BIA summarily adopts the immigration judge's decision but adds additional commentary, this Court "directly reviews the decision of the IJ while considering the additional comment[s] made by the BIA." *Mapouya v. Gonzales*, 487 F.3d 396, 405 (6th Cir. 2007). This Court reviews questions of law in

immigration proceedings de novo, "but substantial deference is given to the BIA's interpretation of the INA and accompanying regulations." *Khalili*, 557 F.3d at 435. We also review due process claims in removal proceedings de novo. *Mapouya*, 487 F.3d at 406. Findings of fact are reviewed under a substantial-evidence standard and can be reversed only where the record compels a contrary conclusion. *Id.* at 405.

**B. Asylum**

*1. Standards for Obtaining Asylum and Withholding of Removal*

An immigration judge has discretion to grant an application for asylum under 8 U.S.C. § 1158(b)(1). *See Mapouya*, 487 F.3d at 406. An applicant is entitled to receive asylum if he or she qualifies as a "refugee" and merits a favorable exercise of discretion by the immigration judge. *Id.* "Refugee" is defined as "any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). The applicant has the burden of establishing that he or she qualifies as a refugee. *Mapouya*, 487 F.3d at 406. The applicant can establish the persecution element by demonstrating that he or she has suffered past persecution or by showing a well-founded fear of future prosecution.[1] *Id.* at 412. "Proof of past persecution raises a rebuttable presumption of a well-founded fear of

---

[1]Asylum also can be granted in the absence of a well-founded fear of persecution if the applicant has demonstrated that the past persecution was especially severe and that there is a reasonable possibility that he or she may suffer further "serious harm" if returned to his or her home country. 8 C.F.R. § 208.13(b)(1)(iii).

persecution." *Mohammed v. Keisler*, 507 F.3d 369, 371 (6th Cir. 2007) (citing 8 C.F.R. § 208.13(b)(1)). This presumption can be rebutted if the Government shows that (1) "[t]here has been a fundamental change in circumstances" in the applicant's home country so that he or she no longer has a well-founded fear of persecution, or (2) "[t]he applicant could avoid future persecution" by relocating within his or her home country. 8 C.F.R § 208.13(b)(1). To rebut the presumption based on changed country conditions, the Government must establish by a preponderance of the evidence that,

> conditions in the applicant's country have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted upon return. The [Government] must do more than show that circumstances in the country have fundamentally changed; [it] must also show that such change negates the particular applicant's well-founded fear of persecution.

*Ouda v. INS*, 324 F.3d 445, 452 (6th Cir. 2003). "If the government rebuts the presumption, the applicant 'must demonstrate a well-founded fear of future persecution notwithstanding' the changed country conditions." *Mapouya*, 487 F.3d at 412 (quoting *Liti v. Gonzales*, 411 F.3d 631, 639 (6th Cir. 2005)).

Eligibility for withholding of removal is governed by the same framework, but requires a higher showing by the applicant and is not discretionary. "Unlike a grant of asylum, withholding of removal is mandatory if the applicant can establish a clear probability of future persecution." *Khora v. Gonzales*, 172 F. App'x 634, 640 (6th Cir. 2006). Because of the higher "clear probability" burden of proof, "an applicant who fails to meet the statutory eligibility requirements for asylum must necessarily fail to meet the requirements for withholding of removal." *Ben Hamida v. Gonzales*, 478 F.3d 734, 741 (6th Cir. 2007).

*2. Rebutting Alcius's Presumptive Well-Founded Fear of Persecution*

The IJ and BIA determined that Alcius's 1994 detention constituted past persecution, giving rise to a presumption that he has a well-founded fear of persecution. Whether an applicant qualifies as a refugee is a factual determination reviewed under the substantial-evidence standard. *Gilaj v. Gonzales*, 408 F.3d 275, 283 (6th Cir. 2005). We remand because the IJ's determination that the Government rebutted Alcius's presumptive well-founded fear of persecution is not supported by substantial evidence.

In his original 2005 decision, the IJ rested his finding that Alcius did not have a well-founded fear of future persecution on Alcius's ability to relocate within Haiti to an area still controlled by Lavalas supporters. In his second decision, the IJ came to the same conclusion, but with a new justification: the IJ determined the Government had rebutted the presumption by demonstrating a fundamental change in circumstances in Haiti since the time Alcius was detained in 1994. This conclusion was not supported by substantial evidence because, even though the military regime that originally persecuted Alcius has not been in power since 1994, the evidence in the record demonstrates that Lavalas supporters like Alcius are once again being persecuted since Aristide's 2004 ouster.

The documentary evidence in the record—even the reports submitted by the Government—demonstrates that human-rights abuses remained widespread in Haiti following Aristide's 2004 ouster and that pro- and anti-Aristide partisans were particular targets of violence and persecution. In particular, a 2005 U.S. State Department report, submitted by the Government, noted that after Aristide's removal, "retribution killings and politically motivated violence continued

throughout the country," including arbitrary killings and disappearances carried out by the Haitian National Police and arbitrary killings by "members of the disbanded armed forces . . . who helped force President Aristide's resignation." (P. App'x 118.) That same report noted a violent campaign of kidnapping, murder, and arson, carried out by pro-Aristide supporters in Port-au-Prince that was met with police sweeps of pro-Aristide neighborhoods resulting in numerous warrantless arrests and prolonged detentions without judicial oversight.[2] The other documentary evidence in the record provides similar findings, including reports of extrajudicial, retribution killings of Lavalas partisans, police brutality against Lavalas supporters, and Lavalas supporters being held as political prisoners.

The IJ failed to consider this documentary evidence properly. Instead of grappling with the reports of ongoing violence against Aristide and Lavalas supporters, the IJ discounted them based on reports that some Aristide and Lavalas supporters also committed violent acts. For instance, the IJ stated that "[Alcius] believes that the violence was directed against FL members, but the State Department and other reports show violence and brutality on both sides." (P. App'x 32.) Later, he stated that the documentary evidence,

> clearly show[s] that the violence between FL and the former military/FRAPH elements is a battle between terrorists. Even [Alcius] does not fear persecution from the national government of Preval, he merely fears that the government cannot

---

[2]These developments in Port-au-Prince are significant because the IJ noted in his 2005 ruling that Alcius "would not be in any greater danger . . . than anybody else if he returns to Port-au-Prince." (R. App'x 226.) The developments suggest that Aristide supporters became more vulnerable in 2005 and intra-country relocation would no longer be an option.

protect him. . . . Therefore, he does not qualify for asylum or withholding of removal.[3]

(P. App'x 42.) In order to find that the Government rebutted Alcius's presumptive well-founded fear of persecution, the IJ and BIA were required, at a minimum, to address substantively the evidence in the record that Aristide and Lavalas supporters were still being persecuted. In *Ileana v. INS*, 106 F. App'x 349 (6th Cir. 2004), this Court determined that the IJ and the BIA had erred by not addressing the portions of the country reports—the same reports relied upon for the determination that country conditions had changed—that supported the applicant's fears of persecution. *Id.* at 354-57. "This is not to say that [the IJ and BIA] got it wrong, but their failure to grapple with the evidence on the other side—that notwithstanding broad improvements, local abuses by police remain—suggests that the decision must be sent back for a more complete analysis." *Id.* at 357.

Instead of grappling with the numerous reports that Lavalas supporters like Alcius were at risk of persecution after Aristide's 2004 ouster, the IJ wrote them off simply because Lavalas supporters were also implicated in the violence. If anything, the reports of pro-Aristide violence tend to support a conclusion that Alcius's fear is well-founded since such violence would tend to provoke violent responses against Aristide supporters, a phenomenon which the documentary evidence bears out. Although the political landscape in Haiti has undergone waves of change since 1994, the

---

[3]These statements also indicate that the IJ may have conflated the standards for asylum and CAT relief in evaluating Alcius's asylum claim by implying that Alcius had to show that his persecution would come at the hands of the Haitian government. *Cf. Singh v. Ashcroft*, 398 F.3d 396, 405 (6th Cir. 2005) (vacating BIA decision denying CAT relief because the IJ and BIA conflated the asylum and CAT standards by requiring that the potential torture be related to the protected categories for asylum).

Government did not show that these changes negated Alcius's well-founded fear of persecution. *See*

*Ouda*, 324 F.3d at 452. Here, the IJ failed to address the evidence pointing in the opposite direction

and instead relied on the terse conclusion that the current Haitian regime "is not remotely identifiable

with the right-wing elements that were responsible for the March 1994 incident. Therefore, the

[Government] has rebutted the presumption resulting from past persecution." (P. App'x 41.) Our

review demonstrates that Alcius's case "must be sent back for a more complete analysis" of whether

the Government successfully rebutted the presumption that Alcius has a well-founded fear of

persecution if he returns to Haiti. *Ileana*, 106 F. App'x at 357.

### 3. Due Process Concerns

Another discrepancy between the two sets of hearings and opinions concerns the

corroboration of Alcius's account of his grandfather's murder. At the first hearing, the IJ noted that

Alcius's account was consistent with the documentary evidence about violence against Aristide

supporters in Gonaïves in February 2004. At that hearing, the IJ also had before him the

corroborating letter and photograph from Alcius's grandfather's neighbor, Gary Antoine. In contrast,

the IJ's second opinion rested specifically on a finding that Alcius had not supplied corroborating

evidence about his grandfather's murder. Although Alcius had the opportunity to resubmit the

corroborating photograph and letter at the second merits hearing and failed to do so, the documents

originally submitted by Alcius were lost by either the immigration court or the BIA. In doing so,

they failed in their duty to keep "a complete record . . . of all testimony and evidence produced at the

proceeding" and undermined Alcius's right "to present evidence on [his] own behalf." 8 U.S.C. §

1229a(b)(4)(B)-(C).

This Court has expressed concern about, and noted the due process implications of, the BIA failing to comply with its obligation to prepare a reasonably accurate and complete record of removal proceedings under 8 U.S.C. § 1229a(b)(4)(C). *See Garza-Moreno v. Gonzales*, 489 F.3d 239, 241-42 (6th Cir. 2007); *Sterkaj v. Gonzales*, 439 F.3d 273, 279 (6th Cir. 2006). The loss of the entire record and the lack of clarity about what, if anything, remained in the record from the first hearing is particularly disconcerting. Although Alcius had an opportunity to resubmit his evidence, the fact that the Government cross-examined Alcius specifically about Antoine's letter at the second hearing indicates that both parties were at best unclear as to whether the evidence was part of the record. In *Mapouya*, this Court found that the IJ and BIA erred in denying the applicant asylum because their opinions failed to consider two corroborating letters he submitted "that tend[ed] to show he still face[d] an individualized threat of future persecution, notwithstanding the changed country conditions." *Mapouya*, 487 F.3d at 412. We do not suggest that the IJ should have relied on a letter and photograph that were no longer in the record. However, it is notable that corroborating evidence was introduced at the first merits hearing, the IJ's second decision rested specifically on the lack of such evidence, and on both occasions the IJ found Alcius to be otherwise credible. Given the high stakes of deportation proceedings and the possible due process implications of the immigration court or BIA losing evidence, remand is necessary in this case to ensure that Alcius is afforded a hearing where both parties have the opportunity to submit all relevant evidence and it is clear what is, and what is not, part of the record.

Beyond the loss of the record, there were a number of other peculiarities in the way Alcius's case was handled below that raise concerns about the impartiality of the proceedings. These include

the IJ's sua sponte introduction of evidence (though it was properly excluded and not considered in his decision), the IJ's commentary about his particular expertise on Haitian politics and history, and his expression of his negative opinions of Aristide and Lavalas. We note that "'[t]he determination of the immigration judge shall be based *only on* the evidence produced at the hearing.'" *Vasha v. Gonzales*, 410 F.3d 863, 873 (6th Cir. 2005) (quoting 8 U.S.C. § 1229a(c)(1)(A)). In an abundance of caution, and because of the importance of assuring that aliens be afforded fair removal proceedings, we order that this case be assigned to a different immigration judge on remand. *See Elias v. Gonzales*, 490 F.3d 444, 453 (6th Cir. 2007) (citing *Mece v. Gonzales*, 415 F.3d 562, 578 (6th Cir. 2005)).

## C. Convention Against Torture

Because we remand the case to the BIA based on the IJ's evaluation of Alcius's asylum and withholding of removal claims, we need not reach his claim for CAT relief.

## III. CONCLUSION

The petition for review is **GRANTED**, the BIA's decision is **VACATED**, and the case is **REMANDED** to the BIA with instructions that it be assigned to a different immigration judge for further proceedings not inconsistent with this opinion.

**BOGGS, Circuit Judge, dissenting.** I disagree with my colleagues that the record in this case compels us to conclude that substantial evidence did not support the determination of the IJ and BIA that the government had rebutted the legal presumption that Alcius had a well-founded fear of persecution. In my opinion, the record demonstrates that, while Haiti may have been a maelstrom of chaos, violence, and corruption, it was no more so with respect to the petitioner than it was with respect to the general populace.

The majority cites to a 2005 State Department report for the proposition that "'retribution killings and politically motivated violence continued throughout the country,' including *arbitrary* killings and disappearances carried out by the Haitian National Police and *arbitrary* killings by 'members of the disbanded armed forces . . . who helped force President Aristide's resignation.'" Maj. Op. at 9–10 (emphases added). It was not reversible error for the IJ and BIA to take the report at its word when it characterized these acts as "arbitrary," a term that implies that they were done without regard for the victims' political ideology, and indeed there is very little indication in the report that this violence—politically *motivated* as it may have been—was directed at victims chosen for *their* politics.[1] *See INS v. Elias-Zacarias*, 502 U.S. 476, 482 (1992) (rejecting a claim of well-founded fear of future persecution that was based on a politically-neutral applicant's refusal to fight with guerilla forces in Guatemala). The report further specifically indicates that much of the

---

[1]The report's passing reference to "retribution killings" does not explain who was targeted for retribution, or why.

widespread violence in Haiti had changed from a tool of political intimidation to a "broader type of criminality committed by gangs with no specific political characteristic."[2]

A petitioner "cannot rely on speculative conclusions or mere assertions of fear of possible persecution, but must instead offer reasonably specific information showing a real threat of individual persecution." *Mapouya v. Gonzales*, 487 F.3d 396, 412 (6th Cir. 2007). We have consistently held that widespread indiscriminate violence does not constitute the kind of individualized targeting required for a grant of refugee status. *See, e.g.*, *Lumaj v. Gonzales*, 462 F.3d 574, 578 (6th Cir. 2006) (rejecting a claim of well-founded fear of future persecution because although a widespread threat of violence existed in Albania, there was no evidence that individuals were targeted on political grounds). The documentary evidence contained in the State Department report contains only one example of Aristide supporters being persecuted *because* they were Aristide supporters: the police sweeps of pro-Aristide neighborhoods in Port-au-Prince mentioned by the majority, which came about in response to a weeks-long campaign of violence conducted by Aristide partisans in that same city. Given that we uphold the decision below if it is supported by the record considered as a whole, *Elias-Zacarias*, 502 U.S. at 481, this single example does not suffice to compel the conclusion that Jean Alcius, who had neither been involved in Haitian politics nor even

---

[2]The "other documentary evidence" referenced by the majority, including reports from Human Rights Watch and Globalsecurity.org, is similarly vague as to the nature and extent of *anti*-Fammi Lavalas violence, though it contains quite a bit of documentary evidence of violence by pro-Lavalas forces. In any event, we have held that State Department reports may generally be taken by an IJ as the best evidence available to ascertain country conditions in the context of asylum hearings. *Mullai v. Ashcroft*, 385 F.3d 635, 639 (6th Cir. 2004).

physically present in Haiti for any significant length of time since 1995, would be singled out for persecution upon his return.[3]

As the record indicates, the pro-Aristide Fammi Lavalas party participated in the February 2006 elections in Haiti, insofar as it formed an alliance with another party and registered a candidate for president; in fact, the victor in that election was former Lavalas member Rene Preval, who ran as the candidate of another coalition group. From this evidence, and from the fact that no other crackdowns occurred despite a significant pro-Aristide population during the relevant period of time, the BIA/IJ could certainly have rationally concluded that the single crackdown in Port-au-Prince was a response more to the violence perpetrated in those neighborhoods than the politics of the perpetrators.

Moreover, the majority fails to address a crucial rationale set forth in by the IJ. The majority faults the IJ for not "grappling with" the evidence that Alcius claims supports his argument that he has a well-founded fear of future persecution, and states that "the IJ and the BIA were required, at a minimum, to address substantively the evidence in the record that Aristide and Lavalas supporters were still being persecuted." Maj. Op. at 11. In addition to the fact that such evidence seems to have been in short supply, the majority itself has a similar failing. In dismissing the IJ's analysis as a

---

[3]As evidence that Lavalas supporters were at risk of persecution, the majority makes the creative argument that "the reports of pro-Aristide violence tend to support a conclusion that Alcius's fear is well-founded since such violence would tend to provoke violent responses against Aristide supporters, a phenomenon which the documentary evidence bears out." Maj. Op. at 11. Hence they would read evidence of murder and mayhem committed *by* a political organization as evidence of persecution *of* that group. This logic is the embodiment of the "speculative conclusions or mere assertions of fear" prohibited by *Mapouya*.

shallow attempt to label Haiti's internal conflict as a "battle between terrorists," the majority ignores the core of the IJ's rationale: that any extra-governmental sectarian violence between Lavalas forces and their rivals was irrelevant (to the extent Lavalas forces might have been persecuted at all), because Alcius himself was in no individualized danger because his association with the Fammi Lavalas was minor and had ended twelve years prior. The IJ's characterization of the violence between the Fammi Lavalas and FRAPH elements as being "between terrorists" was merely a predicate to his observation that Alcius did not fear persecution from the *government*, but rather allegedly feared the government could not protect him from anti-Aristide forces; ultimately, the IJ's argument was that there was no reason to expect that those forces would target him in the first place. Hence I see no point in requiring the IJ to grapple with nebulous, conclusory statements about the existence of persecution that, at most, demonstrated the existence of an irrelevance.

The evidence produced by Alcius failed to establish either that pro-Aristide partisans were being systematically targeted or that he himself would be identified as affiliated with those partisans. Either of these deficiencies would be enough, in my opinion, to demonstrate that he lacked a well-founded fear of future persecution.

For all that I believe the majority to be in error with respect to its treatment of Alcius's claims of a well-founded fear of future persecution, I nevertheless recognize that reasonable jurists may disagree as to when they may be "compelled to conclude" something. However, the majority's treatment of the argument raised by Alcius with respect to the evidence submitted by him but lost after his first IJ hearing is unavailing.

It is certainly true that the loss of evidence submitted by Alcius is, as the majority puts it, "disconcerting." But it is absolutely not true that Alcius lacked a meaningful opportunity to re-introduce that evidence, or that the Immigration Judge was in any way unclear in communicating the fact that the evidence had been lost.

The transcript of the proceedings of March 13, 2006, that occurred on remand to the IJ following the BIA's determination that Alcius's file had been lost, contains the following exchange:

[JUDGE TO COUNSEL]. But apparently the Board has misplaced the entire file. The Government is going to give the copy of the charging document and the copy of the I-589 itself with attached affidavits, but not all the evidence.

[. . .]

Counsel, you need to re-file new evidence to go with the I-589. Also if the I-589 needs to be amended at this point, you need to do so. Just, you know, don't file a new I-589, just file something that indicates the amendments to it.

A.      Okay.

Q.     And but you do need to re-file all supporting documentation, all evidence—I sure hope that one of the original documents in there [sic]. I have no idea what was in the file when it went to the Board.

A.     I rarely file those, if I don't have to, so---

[DEPARTMENT OF HOMELAND SECURITY ATTORNEY].  There are newspaper, there is a newspaper article, at least one original in the, in the---

Q.     Well, the original are [sic] lost and gone forever, so hopefully people have copies.  In any event, we're going to do a whole new hearing on August 28, 2006 at 2 o'clock.

[. . .]

And you need to re-file, or file for the first time, any evidence supporting the application.

A.     Okay.

Q.     Did you have any witnesses testify last time?

A.      No, I didn't.

Q.      All right.   Well, you can—this is a new hearing, so you can do whatever you want this time.

A.      All right.

"You need to file new evidence to go with the I-589."  "You do need to re-file all supporting documentation, all evidence."  "The original[s] are lost and gone forever."  "You need to re-file . . . any evidence supporting the application."  "This is a new hearing, so you can do whatever you want this time."  I struggle in vain to comprehend how the IJ could possibly have been any clearer, nor does the majority have any suggestions as to a procedure that would have passed muster with them.

The simple fact is that, when the evidence submitted by Alcius was lost, the BIA and the IJ did exactly what it was supposed to do: told him of the problem and gave him an entirely new chance to present his case.  The problem here was not with the BIA or the IJ's approach, but with Alcius's attorneys, who did not take adequate steps to ensure that the missing evidence was re-introduced.[4] In my view, remanding on Alcius's due process argument is merely a way of cleaning up counsel's

---

[4]Alcius changed attorneys some four months after the hearing of March 13, 2006; apparently his first counsel retired from the practice of law.  His new counsel was employed by the same legal clinic and presumably had access to the hearing transcript and any other relevant materials.

mistake, and it is quite incredible to me that the majority would brand the IJ's behavior in this respect—along with the fact that he introduced evidence that *he himself* later excluded as improper—as evidence of his lack of impartiality.

I respectfully dissent.