RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 21a0269p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____



JONAS NSONGI MBONGA,

          *Petitioner*,

                  No. 20-4268

  *v.*

MERRICK B. GARLAND, Attorney General,

          *Respondent*.

On Petition for Review from the Board of Immigration Appeals.
No. A 215 913 759.

Argued: October 21, 2021

Decided and Filed: November 22, 2021

Before: McKEAGUE, NALBANDIAN, and MURPHY, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Austin N. Davis, BAKER & HOSTETLER LLP, Cleveland, Ohio, for Petitioner. John F. Stanton, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Austin N. Davis, Michael E. Mumford, BAKER & HOSTETLER LLP, Cleveland, Ohio, for Petitioner. John F. Stanton, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

_____

## OPINION

_____

MURPHY, Circuit Judge. The immigration laws give the Attorney General discretion to grant asylum to "refugees"—a term that includes those who have suffered persecution in their home countries because of their political beliefs. Exercising this discretion, the Attorney General has instructed immigration judges that they generally should deny asylum to refugees

who have suffered past persecution if changed conditions in their countries make future persecution unlikely.  8 C.F.R. § 1208.13(b)(1)(i)(A).  This case requires us to consider the type of evidence that permits the Board of Immigration Appeals to find these disqualifying changed country conditions.

Even though Jonas Nsongi Mbonga previously suffered political persecution in the Democratic Republic of the Congo, the Board of Immigration Appeals denied him asylum because his own political party had since assumed power in the country.  The Board reasoned that this change in the government made any future political persecution unlikely.  Nsongi Mbonga argues that this generic evidence about a national governmental change did not suffice and that the Board needed to rely on specific evidence tailored to his local situation.  His argument gets things backwards under our caselaw.  The Board can find a disqualifying change in conditions using general evidence showing that the political party that persecuted a refugee has lost power, which shifts the burden to the refugee to identify specific evidence proving that persecution still remains likely.  Because Nsongi Mbonga did not present such evidence, we deny his petition for review.

I

Nsongi Mbonga fled the Democratic Republic of the Congo under trying circumstances. While living in the country's capital, he joined an athletic club that practiced jujitsu.  This club had connections with the Congo's then-ruling political party, the People's Party for Reconstruction and Development.  The club's leaders recruited Nsongi Mbonga to join a youth group for this ruling party in October 2013.  These leaders allegedly planned to use this youth group to disrupt peaceful protests by the opposition party, the Union for Democracy and Social Progress.  Finding this plan unjust, Nsongi Mbonga refused to participate.  Nsongi Mbonga instead decided to join the opposition party because of its political platform favoring equality and nonviolence.  He began to attend this opposition party's demonstrations and meetings.

Nsongi Mbonga's refusal to associate with the ruling party had serious repercussions for his safety.  Two months after he declined to join the youth group, police officers allegedly beat him.  Later, in July 2014, officers detained Nsongi Mbonga on his way home from church.  After

they discovered a card in his possession revealing his membership in the opposition party, they hit him with their batons until he lost consciousness. He woke up in a medical center and remained there for four days.

Nsongi Mbonga escaped to neighboring Angola for a short while. In January 2015, however, he came back to the Congo's capital to welcome the return of his political party's leader. The next month, Nsongi Mbonga again found himself in trouble with the police when he and fellow church members were on their way home from a music rehearsal. The officers arrested the group and took them to a detention center. Over four days, Nsongi Mbonga alleges, prison guards horribly mistreated him. He suffered beatings, torture, death threats, and sleep deprivation. The guards told him that they engaged in this abuse because of his refusal to join the ruling party.

Though his family secured his release, Nsongi Mbonga still feared for his safety. He left the capital and relocated to a small village, where he stayed for two years. When government forces got word of his location, he fled the Congo altogether. In July 2018, Nsongi Mbonga completed an arduous journey to the United States.

He applied for asylum, withholding of removal, and relief under the Convention Against Torture. An immigration judge denied relief. The judge expressed vague "concerns" with Nsongi Mbonga's credibility. Admin. R. (A.R.) 310. The Board reversed, ordering the judge to make a clearer credibility finding.

On remand, a different immigration judge again denied relief. Based on the paper record, this judge expressly found that Nsongi Mbonga was not credible. The judge next explained that he would have denied asylum to Nsongi Mbonga even if he had testified credibly. Although Nsongi Mbonga's testimony may have shown past persecution, the judge reasoned that he lacked a likelihood of future persecution because of changed conditions in the Congo. The country had since elected a new president (Felix Tshisekedi) from Nsongi Mbonga's own political party (the Union for Democracy and Social Progress). The judge denied Nsongi Mbonga's claims for withholding of removal and protection under the Convention Against Torture on similar grounds.

This time, the Board affirmed. It rejected Nsongi Mbonga's claim that the immigration judge mistakenly found him not credible without holding a second evidentiary hearing. Assuming Nsongi Mbonga's credibility, the Board next upheld the judge's finding that changed conditions in the Congo (the election of a president from Nsongi Mbonga's party) eliminated his reasonable fear of political persecution. And while an alternative form of asylum ("humanitarian asylum") did not require any likelihood of future persecution, the Board found that Nsongi Mbonga did not qualify for this distinct form of relief either. The Board lastly affirmed the denial of Nsongi Mbonga's claims for withholding of removal and relief under the Convention Against Torture.

## II.  Asylum

Nsongi Mbonga challenges the Board's denial of asylum in two ways. He argues that the Board wrongly upheld the immigration judge's adverse credibility finding and wrongly decided that President Tshisekedi's election eliminated his reasonable fear of persecution. Yet the Board's opinion leaves unclear whether it even resolved the credibility issue. When holding that the change in the government barred relief, it simply assumed Nsongi Mbonga's credibility. And we generally may not address an issue that the Board did not reach. *See INS v. Orlando Ventura*, 537 U.S. 12, 16–17 (2002) (per curiam); *Juncaj v. Ashcroft*, 111 F. App'x 424, 426 (6th Cir. 2004).

Ultimately, we need not rely on the credibility finding. Even if we likewise assume that Nsongi Mbonga testified credibly, the Board did not commit error in holding that the governmental changes in the Congo eliminated any well-founded fear of persecution. Nsongi Mbonga also failed to preserve his "humanitarian asylum" claim that does not require such a well-founded fear.

### A.  Asylum Based on a Well-Founded Fear of Persecution

Under the immigration laws, the Attorney General "may grant asylum" to an applicant if the Attorney General finds that the applicant qualifies as a "refugee" under a statutory definition of that word. 8 U.S.C. § 1158(b)(1)(A). This text requires courts to consider two basic questions when reviewing the Board's denial of asylum. *See Mapouya v. Gonzales*, 487 F.3d 396, 406 (6th

Cir. 2007). (The Attorney General has delegated the power to grant asylum to the Board. *See* 8 C.F.R. § 1003.1(a)(1).) The first question: Does an asylum applicant qualify as a "refugee"? The immigration laws define "refugee" to include:

> any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion[.]

8 U.S.C. § 1101(a)(42)(A). To meet this refugee definition, applicants must show either that they suffered past "persecution" in their home country or that they have a "well-founded fear of persecution" in that country because of, among other grounds, their "political opinion." *Id.*; *see INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 (1987).

Yet an applicant's "refugee" status does not guarantee asylum. The asylum statute says that the Attorney General "may" grant asylum to refugees, so it leaves the Attorney General with residual discretion to deny relief to otherwise eligible refugees. *See Cardoza-Fonseca*, 480 U.S. at 428 n.5. If an applicant qualifies as a refugee, therefore, a court must move on to the second question: Does the refugee warrant a favorable exercise of the Attorney General's discretion? *See Hyzoti v. Mukasey*, 269 F. App'x 563, 565 (6th Cir. 2008).

The Attorney General has issued a regulation that guides the executive branch's decisions about which refugees merit a favorable exercise of discretion. *See* 8 C.F.R. § 1208.13(b)(1)(i). This regulation recognizes that, as the statutory definition makes clear, an applicant can qualify as a refugee based on "past persecution" alone. *Id.* § 1208.13(b)(1); *see Matter of Chen*, 20 I. & N. Dec. 16, 18 (BIA 1989). If the applicant establishes past persecution, moreover, the Attorney General presumes that the refugee has a well-founded fear of future persecution. 8 C.F.R. § 1208.13(b)(1). Nevertheless, the Attorney General has told immigration judges that they should generally deny an asylum claim as a matter of discretion if "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country" based on the applicant's political beliefs. *Id.* § 1208.13(b)(1)(i)(A).

This regulation adopts a burden-shifting approach to the "changed conditions" restriction on asylum. To trigger the duty to deny asylum as a discretionary matter, the immigration authorities (not the applicant) must establish by a preponderance of the evidence that the country's conditions have changed in a way that eliminates the applicant's well-founded fear of persecution. *Id.* § 1208.13(b)(1)(ii). If the government does so, the applicant then "bears the burden of establishing that the fear is well-founded" based on conditions currently existing in the country. *Id.* § 1208.13(b)(1); *see Nozadze v. Sessions*, 740 F. App'x 476, 480 (6th Cir. 2018).

Under this burden-shifting framework, the government's initial burden requires it to establish more than just that a country's conditions have changed. The government must tie that change to the specific refugee's situation by showing that the refugee now lacks a *well-founded* fear of persecution. *See Ouda v. INS*, 324 F.3d 445, 452 (6th Cir. 2003); *see also Mapouya*, 487 F.3d at 412. That said, this applicant-specific *element* should not be confused for a mandate to present applicant-specific *evidence*—say, evidence that the specific person who persecuted the refugee has died. To the contrary, general sources (commonly, country-condition reports from the State Department) regularly meet the government's burden to show that changed conditions rebut a refugee's well-founded fear of persecution. *See, e.g.*, *Mecca v. Holder*, 604 F. App'x 465, 469 (6th Cir. 2015); *Borodachev v. Holder*, 441 F. App'x 354, 361 (6th Cir. 2011); *Ramaj v. Gonzales*, 466 F.3d 520, 531 (6th Cir. 2006); *Mullai v. Ashcroft*, 385 F.3d 635, 639 (6th Cir. 2004).

How might this general evidence render a specific refugee's fear of persecution unfounded? Often times, the evidence will show that a new political party has taken control of a country's government from the party that persecuted the refugee in the past. *See Nozadze*, 740 F. App'x at 481–82. This change can rebut a refugee's fear of persecution if that fear is tied to the now-outdated opposition to the prior government. Consider, for example, our many cases involving Albanian asylum applicants. That country's once-existing communist and socialist regimes persecuted many who opposed them. After those governments lost power, however, asylum applicants who previously suffered abuse at their hands could not show that they reasonably feared future abuse from the new government. *See, e.g.*, *Trifoni v. Holder*, 351 F. App'x 19, 23–24 (6th Cir. 2009); *Ndrecaj v. Mukasey*, 522 F.3d 667, 676–77 (6th Cir.

2008); *Ramaj*, 466 F.3d at 531; *Lakaj v. Gonzales*, 158 F. App'x 678, 682 (6th Cir. 2005). This governmental change instead switched the burden to the Albanian asylum applicants to explain why they had a continued fear of persecution. *See Liti v. Gonzales*, 411 F.3d 631, 639 (6th Cir. 2005), *superseded by statute on other grounds as stated in Nozadze*, 740 F. App'x at 480.

Governmental changes in many countries have led to the same result. We have repeatedly held that Iraqi refugees who had been persecuted by Saddam Hussein's government lacked a well-founded fear of persecution after that government lost power. *See Imsaiah v. Gonzales*, 225 F. App'x 362, 366 (6th Cir. 2007) (collecting cases). Similarly, we have held that a Tanzanian refugee who had been persecuted by authorities lacked a well-founded fear of persecution once the refugee's own party entered into a power-sharing arrangement in a new government. *See Mecca*, 604 F. App'x at 468–69. And we have held that a refugee from Bangladesh lacked a well-founded fear of persecution once a new coalition government that included the refugee's own party took power. *See Mehboob v. INS*, 122 F. App'x 209, 214–15 (6th Cir. 2005). Similar cases are not hard to find. *See, e.g.*, *Compaore v. Barr*, 788 F. App'x 355, 359–60 (6th Cir. 2019) (Burkina Faso); *Hachem v. Holder*, 656 F.3d 430, 437 (6th Cir. 2011) (Lebanon); *Chieh v. Holder*, 411 F. App'x 800, 803–04 (6th Cir. 2011) (Liberia); *Sy v. Mukasey*, 278 F. App'x 473, 476–77 (6th Cir. 2008) (Mauritania); *Sarr v. Gonzales*, 485 F.3d 354, 361 (6th Cir. 2007) (Senegal).

*

Applying this law, the Board reasonably upheld the immigration judge's finding that changed conditions in the Congo rebutted Nsongi Mbonga's well-founded fear of persecution. We review this changed-conditions finding under the substantial-evidence test. *See Mecca*, 604 F. App'x at 468–69; *Ramaj*, 466 F.3d at 531. That test requires us to defer to the executive branch's opinion. We may not reverse simply because a reasonable adjudicator could believe that Nsongi Mbonga still had a well-founded fear of persecution despite the changes in the Congo; we may reverse only if the evidence would compel all reasonable adjudicators to find that a well-founded fear remained. *See Ceraj v. Mukasey*, 511 F.3d 583, 588 (6th Cir. 2007); 8 U.S.C. § 1252(b)(4)(B).

Nsongi Mbonga cannot overcome this deferential standard. After he fled the Congo, Felix Tshisekedi, the leader of his political party, became the president. The immigration judge found that the country's current political oppression thus seemed to originate with Nsongi Mbonga's own party and was directed against others. The judge further found that President Tshisekedi rose to power as a result of a power-sharing agreement with the former party that had persecuted Nsongi Mbonga. According to the judge, the cooperation between the two parties made it even less likely that members of one party would attack members of the other based on their political views. If adequately supported, these findings sufficed under our caselaw to establish that changed conditions in the Congo eliminated Nsongi Mbonga's well-founded fear of persecution. *See Mecca*, 604 F. App'x at 468–69; *Mehboob*, 122 F. App'x at 214–15.

And the findings have adequate record support. The immigration judge relied on news articles (sources that Nsongi Mbonga does not challenge). *Cf. Sy*, 278 F. App'x at 476. Articles from Amnesty International and other entities discussed President Tshisekedi's election and noted that he had pardoned hundreds of political prisoners who had been imprisoned by the prior regime. These articles also indicated that Tshisekedi was working on establishing conditions that would permit political exiles to return. Other articles confirmed the power-sharing agreement and noted that members of both parties worked in the new government. To the extent that persecution remains, moreover, Human Rights Watch suggested that the government now directed the persecution at a different political party. This article alleged that the government used excessive force when this third party organized governmental protests on the ground that fraud had tainted Tshisekedi's election. Any such persecution of a different group does not establish Nsongi Mbonga's reasonable fear of persecution. *Cf. Mehboob*, 122 F. App'x at 214–15.

The burden thus shifted to Nsongi Mbonga to prove that he continued to have a well-founded fear of persecution despite the governmental change. *See Liti*, 411 F.3d at 639. Yet the Board could reasonably find that he did not present enough proof to meet this burden. He provided no detailed evidence suggesting that the local officers who persecuted him in the past continue to hold power and still seek to harm him. *Cf. Shalcaj v. Holder*, 495 F. App'x 575, 576–77 (6th Cir. 2012) (per curiam); *Ceraj*, 511 F.3d at 593–94. Nsongi Mbonga relied

primarily on a letter from a family friend who had recently visited the Congo. The friend suggested that Nsongi Mbonga's life would still be in danger "because the security services, the army and the police are still controlled by the masterminds of" the prior regime. A.R. 172. But, as we have held for similar claims, the Board could reject this friend's speculative and conclusory allegations that Nsongi Mbonga still faced a generic risk of harm despite the governmental change. *See, e.g.*, *Trifoni*, 351 F. App'x at 24; *Mehboob*, 122 F. App'x at 213–14. In short, Nsongi Mbonga seeks to prove a well-founded fear of persecution based on an outdated "power structure that no longer exists," and his request for asylum does not "account for [the] new reality" of President Tshisekedi's election. *Chieh*, 411 F. App'x at 804.

\*

In response, Nsongi Mbonga claims that the Board committed a legal error because the general governmental change on which it relied did not offer an individualized assessment of his specific persecution risks. He claims that the Board needed to rely on specific evidence about whether the local officials who had abused him in the past would still attempt to do so. He misreads our law. We have repeatedly relied on general evidence about a country's governmental changes to uphold a changed-conditions finding. As we said in a case about Albania, "the collapse of the communist regime may be a sufficient change in country conditions to rebut that presumption" of future persecution. *Liti*, 411 F.3d at 639. We did not also require the Board to discuss the status of the refugee's specific abusers. *See id.* at 639–40. Indeed, our reliance on the State Department's country-condition reports would make no sense under Nsongi Mbonga's view because those reports typically do not include this granular level of detail about a specific risk to a specific refugee. *See Mecca*, 604 F. App'x at 469; *Shalcaj*, 495 F. App'x at 577. Our caselaw instead shifts the burden to a refugee to present this type of evidence about continuing threats to the refugee despite the country's new government. *See Liti*, 411 F.3d at 639.

The three of our cases on which Nsongi Mbonga relies do not hold otherwise. *See Mapouya*, 487 F.3d at 412–13; *Alcius v. Holder*, 374 F. App'x 583, 588–89 (6th Cir. 2010); *Ileana v. INS*, 106 F. App'x 349, 357 (6th Cir. 2004). The asylum applicant in *Mapouya* suffered past political persecution in the Republic of Congo (a different country near the one at

issue in this case).  487 F.3d at 402 & n.3, 403.  The Board found changed conditions because the applicant's party had become a "major" one since he left.  *Id.* at 412 n.20.  In other words, no governmental change had occurred; the prior party that persecuted the applicant remained in power.  The applicant also presented specific evidence that this party's officials still sought to harm him, including a letter from a friend noting that the officials were looking for him.  *Id.* at 411, 413.  Because the record left unclear whether the Board knew about this letter, we remanded for it to reassess the evidence.  *Id.* at 413.  We thus held that the Board lacked substantial evidence for a purely procedural reason.  *Id.*  Here, by contrast, Nsongi Mbonga does not raise a procedural claim that the Board ignored evidence.  The Board also relied on an actual change in the government; it did not rely on a mere change in the status of the applicant's party.  And while Nsongi Mbonga presented evidence that the party that persecuted him retained unofficial power, this evidence did not compel the Board to find that it would still seek to harm him despite its cooperation with his own party.  *See Bah v. Holder*, 424 F. App'x 427, 433 (6th Cir. 2011).

The asylum applicant in *Alcius* left Haiti after suffering from political persecution.  374 F. App'x at 584, 588.  The Board found changed country conditions because the applicant's political party had taken power after this persecution.  *Id.* at 588.  We held that this conclusion lacked substantial evidence because, by the time of the asylum application, the applicant's party had again been deposed and the current government had gone back to persecuting its members.  *Id.* at 585, 588.  In this case, by contrast, Nsongi Mbonga's party remains in power in the Congo.

Lastly, the asylum applicant in *Ileana* had suffered persecution in Romania.  106 F. App'x at 351–54.  The Board found changed conditions based on State Department reports showing that the Romanian government had changed.  *Id.* at 354.  We held that substantial evidence did not support this conclusion for the same procedural reason as in *Mapouya*: the Board seemingly ignored other evidence suggesting that the new government still persecuted its prior political opponents.  *Id.* at 355–57.  Here, by contrast, Nsongi Mbonga cites no evidence showing continued oppression of his party.  If anything, the evidence suggests that his party now persecutes others.

In sum, substantial evidence supported the Board's conclusion that Nsongi Mbonga lacked a well-founded fear of persecution in the Congo because his own party had come to power. And Nsongi Mbonga (not the immigration authorities) bore the responsibility to produce specific evidence that he was still likely to suffer persecution despite this major change.

B. "Humanitarian" Asylum

Unable to show a well-founded fear of future persecution, Nsongi Mbonga had one other route to seek a favorable exercise of the Attorney General's asylum discretion. The regulation standardizing this discretion also allows a refugee who has suffered past persecution to obtain discretionary relief by relying on "the severity of the past persecution" or by showing "a reasonable possibility that he or she may suffer other serious harm" in his or her home country. 8 C.F.R. § 1208.13(b)(1)(iii). This type of claim (which does not require a well-founded fear of future persecution) has come to be called "humanitarian asylum." *See Nozadze*, 740 F. App'x at 483.

Here, however, Nsongi Mbonga did not adequately raise a humanitarian-asylum claim in our court. Just like any other litigant, an immigration petitioner must raise a claim in the opening brief to preserve it. *See, e.g.*, *Toure v. Holder*, 464 F. App'x 513, 514 (6th Cir. 2012) (per curiam) (citing *Cruz-Samayoa v. Holder*, 607 F.3d 1145, 1154–55 (6th Cir. 2010)). Yet Nsongi Mbonga did not even use the phrase "humanitarian asylum" in his opening brief, let alone make a coherent argument why he could satisfy either of the two tests in § 1208.13(b)(1)(iii).

In his reply brief, Nsongi Mbonga argues that his changed-conditions argument is relevant to this claim. Not so. By definition, humanitarian asylum is designed for those who lack a well-founded fear of persecution. So the changed-conditions element (which considers whether that fear exists) does not help decide whether an immigrant can obtain this alternative form of relief. The new conditions in the Congo, for example, say nothing about the "severity of [Nsongi Mbonga's] past persecution" there. 8 C.F.R. § 1208.13(b)(1)(iii).

Nsongi Mbonga also argues that his objections to the immigration judge's adverse credibility finding preserved his humanitarian-asylum claim. But the Board's rejection of this claim did not depend on any credibility finding. The Board denied relief because Nsongi

Mbonga's alleged persecution did not rise to the required level of "severity" and because he did not even argue that he would face "other serious harm" in the Congo. *Id.*

### III.  Other Claims

This conclusion leaves Nsongi Mbonga's claims for withholding of removal and relief under the Convention Against Torture.  These claims fare no better.

Immigrants may obtain withholding of removal to a country by proving that their "life or freedom would be threatened" in that country "because of," among other things, their "political opinion."  8 U.S.C. § 1231(b)(3)(A).  The Supreme Court has interpreted this text as requiring immigrants to show that it is "more likely than not" that they will be harmed in a country. *Cardoza-Fonseca*, 480 U.S. at 430.  This more-likely-than-not test sets a higher bar to relief than the well-founded-fear test required for asylum. *See Kukalo v. Holder*, 744 F.3d 395, 402 (6th Cir. 2011).  So Nsongi Mbonga's claim fails for the same reason that his asylum claim fails: the changed country conditions show that it is not likely that he will suffer harm in the Congo.

Immigrants may obtain relief under the Convention Against Torture, by comparison, if they show that they would likely be tortured in their home country. *See Nasrallah v. Barr*, 140 S. Ct. 1683, 1690 (2020); 8 C.F.R. § 1208.16(c)(2).  But Nsongi Mbonga abandoned his claim under the Convention Against Torture by failing to mention it in his opening brief. *See, e.g.*, *Leiva-Avilez v. Barr*, 767 F. App'x 605, 607–08 (6th Cir. 2019).  He counters that his challenge to the adverse credibility finding could save this claim.  But, as with the Board's decision on his humanitarian-asylum claim, its decision denying Nsongi Mbonga relief did not rely on any credibility finding.  Rather, the Board reasoned that the changed conditions in the Congo showed that Nsongi Mbonga would likely not be tortured there.

We deny the petition for review.