NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0107n.06

Case No. 21-4071

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>KHALID NAIM AKRAWI,<br><br>    Petitioner,<br><br>v.<br><br>MERRICK B. GARLAND, Attorney General,<br><br>    Respondent.</td><td>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td>FILED<br>Mar 01, 2023<br>DEBORAH S. HUNT, Clerk<br><br>ON PETITION FOR REVIEW FROM THE UNITED STATES BOARD OF IMMIGRATION APPEALS<br><br>OPINION</td></tr>
</table>

Before: SUHRHEINRICH, COLE, and MURPHY, Circuit Judges.

MURPHY, Circuit Judge. Khalid Naim Akrawi, a Chaldean Christian from Iraq, became a lawful permanent resident of the United States in 1973. After he spent over three years in prison for manslaughter, an immigration judge ordered him removed to Iraq. When the government sought to carry out his removal 17 years later, Akrawi reopened his immigration proceedings. Akrawi now raises four issues: Is his manslaughter conviction an "aggravated felony" that makes him deportable under 8 U.S.C. § 1227(a)(2)(A)(iii)? Is this offense a "particularly serious crime" that disqualifies him from withholding-of-removal relief under 8 U.S.C. § 1231(b)(3)(B)(ii)? Did the immigration judge wrongly credit the government's experts when denying him relief under the Convention Against Torture? And should the Board of Immigration Appeals have remanded his case so that the immigration judge could consider new evidence? But we lack jurisdiction to consider the first two questions (either because Akrawi failed to exhaust them or because he

disputes factual findings). And, as we have held for many other Chaldean Christians who have sought to prevent their removal to Iraq (including Akrawi's uncle), our deferential standard of review dooms his remaining claims. *See Akrawi v. Garland*, 2022 WL 3681260, at *4–8 (6th Cir. Aug. 25, 2022). We thus dismiss Akrawi's petition in part and deny it in part.

I

Akrawi was born in Iraq in 1961. Admin. R. (A.R.) 1835. He spent his early childhood growing up in that country with his Chaldean Christian family. A.R. 848. According to Akrawi, his uncle tried to assassinate Saddam Hussein at some point and fled the country. A.R. 855. When looking for Akrawi's uncle, the Iraqi police arrested his father and tortured some of his other relatives. A.R. 855–56, 886–87. His family chose to leave Iraq in 1968 when he was seven years old. A.R. 846. After stops in Kuwait and Lebanon, Akrawi and his family made their way to the United States. A.R. 706, 796–97, 846–47. He became a lawful permanent resident in 1973. A.R. 706, 3348. Five years later, he settled in Detroit, Michigan. A.R. 706.

Since adulthood, Akrawi has committed several crimes. A.R. 1842. As relevant here, he pleaded guilty in 1983 to attempting to possess another person's credit card without that person's consent. A.R. 706–07, 3328–35. He served six months in jail for this offense. A.R. 3328.

A decade later, Akrawi participated in a crime that left an innocent bystander dead. A.R. 833, 877. He testified about this crime at an immigration hearing. The uncle who had attempted to assassinate Saddam Hussein had become the "godfather" of Detroit's "Chaldean mafia." A.R. 880. In an apparent attempt to murder Akrawi's uncle, someone engaged in a drive-by shooting at his cousin's house. A.R. 811–12, 821. Akrawi, who was visiting this house and able to identify the culprits, got shot in the hip. A.R. 811–12, 814–15. After an overnight hospital stay, Akrawi returned to the house to find his cousin and three other men organizing a retaliatory attack that his

2

uncle had ordered. A.R. 813, 818–21, 879. They decided to shoot up a store (the "Fiesta Market") that the shooter's father owned. A.R. 820–21, 881. Akrawi claimed that the men planned to leave their guns behind, and Akrawi's cousin tasked him with "pick[ing] up the guns after the shooting." A.R. 820, 824. During the crime, Akrawi testified, he was near the Fiesta Market and heard the gunshots, but he fled without collecting any guns. A.R. 829–30. A schoolteacher who was at the store to buy a gallon of milk was tragically shot and killed in crossfire. A.R. 881.

The State of Michigan charged Akrawi, his uncle, his cousin, and two others with murder and assault. A.R. 3342–44. His uncle stood trial, was convicted of murder, and received a sentence of over 20 years' imprisonment. A.R. 838. His cousin stood trial, was convicted of manslaughter, and received a sentence of over 10 years' imprisonment. A.R. 839. According to Akrawi, he had "nothing to do" with his uncle's criminal enterprise and felt pressured to feign participation in the shooting out of fear that the uncle would harm him if he refused. A.R. 822, 826. Akrawi did not believe that he had committed a crime. But he chose to plead guilty because of the risk that he would receive a longer sentence by going to trial. A.R. 843–44. He signed a "pretrial settlement offer" in which he agreed to plead guilty to what someone handwrote as "manslaughter-voluntary" in return for the dismissal of the other charges. A.R. 3340. Akrawi later pleaded guilty to manslaughter, and a state court sentenced him to an indefinite prison term between 4 and 15 years. A.R. 707–08, 3338–39. He served about three and a half years in prison. A.R. 844.

Soon after Akrawi's release, immigration authorities served him with a "notice to appear" in removal proceedings. A.R. 3348–50. The government identified two reasons why Akrawi was removable under 8 U.S.C. § 1227(a). It alleged that his credit-card and manslaughter offenses qualified as "crimes involving moral turpitude" that together made him deportable under

§ 1227(a)(2)(A)(ii). A.R. 3348. It next alleged that his manslaughter offense qualified as an "aggravated felony" that alone made him deportable under § 1227(a)(2)(A)(iii). A.R. 3348–49.

Appearing at an immigration hearing without counsel in 2000, Akrawi admitted to these convictions and did not challenge the legal conclusion that they made him removable under § 1227(a)(2)(A)(ii) and (iii). A.R. 706–09. Although Akrawi suggested that he might seek relief from his removal under the Convention Against Torture, he later abandoned that request. A.R. 696, 711, 720. The immigration judge thus found that the government had proven both charges and ordered Akrawi removed to Iraq. A.R. 695–97.

The government chose not to deport him immediately. It instead placed him under an order of supervision that prohibited him from traveling outside Michigan without first notifying the authorities and that required him to report every few months. A.R. 2915–19. This status quo lasted for some 17 years. *Id.*

Things changed on June 11, 2017. On that date, Akrawi alleges, immigration authorities carried out a "sweep" of Iraqi Christians who were subject to removal orders to deport them back to Iraq. A.R. 2558, 2783. They took Akrawi into custody during this sweep. *Id.*

Akrawi filed motions to stay his removal and reopen his removal proceedings so that he could seek relief under the Convention Against Torture. A.R. 2783–93, 2937–50. Akrawi alleged that the conditions in Iraq had changed because of the war between the Islamic State (ISIS) and the Iraqi government's responding forces. *See, e.g.*, A.R. 2786–87, 2938–44. He claimed that both sides of this war would likely torture him because of his religion if he returned to the country. *Id.* The immigration judge temporarily stayed Akrawi's removal. A.R. 2780. But the judge later denied his motion to reopen. A.R. 2754. On appeal, the Board of Immigration Appeals reversed

the latter decision. A.R. 1938. Finding that Akrawi had shown materially changed conditions in Iraq, the Board reopened his removal proceedings. *Id.*

On remand, Akrawi moved to overturn the decades-old order finding that his crimes made him removable under 8 U.S.C. § 1227(a)(2)(A). A.R. 1919. He argued that his manslaughter conviction did not qualify as an "aggravated felony" after *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018). The immigration laws define "aggravated felony" to include a "crime of violence" under 18 U.S.C. § 16. 8 U.S.C. § 1101(43)(F). *Dimaya* held that the part of the crime-of-violence definition located in § 16(b) was unconstitutionally vague, 138 S. Ct. at 1213–16, and Akrawi asserted that his manslaughter conviction had been a crime of violence only under this invalid definition, A.R. 1921–22. Even apart from *Dimaya*, Akrawi asserted that he had pleaded guilty to involuntary (not voluntary) manslaughter. A.R. 1928–29. He claimed that involuntary manslaughter was not an "aggravated felony" or a "crime involving moral turpitude." *Id.*

The immigration judge disagreed. A.R. 1910–14. He found as a fact that the state court had convicted Akrawi of voluntary manslaughter. A.R. 1910. The judge next explained that voluntary manslaughter qualified as an "aggravated felony" after *Dimaya* because it was a "crime of violence" under the still-valid definition of that phrase in 18 U.S.C. § 16(a). A.R. 1910–12. The judge then held that voluntary manslaughter was a "crime of moral turpitude." A.R. 1912–14. In short, he found that Akrawi remained removable on the same grounds identified in 2000.

This decision left Akrawi's application seeking relief from removal under the withholding-of-removal statute and the Convention Against Torture. A.R. 1835. The immigration judge denied both types of relief. A.R. 694. He first found that, while Akrawi had a credible fear of returning to Iraq, his account of the Fiesta Market shooting lacked credibility. A.R. 690–91. The judge reasoned that Akrawi's account failed the "common sense" test because Akrawi gave no reason

why the shooters would intentionally drop their guns at the scene of the crime. A.R. 691. The judge next denied Akrawi's request for withholding of removal because voluntary manslaughter was a "particularly serious crime" that barred this relief. *Id.* The judge lastly rejected Akrawi's request for deferral of removal under the Convention Against Torture. A.R. 691–93. According to the judge, Akrawi failed to show (as he must) that the Iraqi government would likely torture him or consent to his torture. *Id.* To reach this finding, the judge concluded that the government's experts gave "more persuasive" testimony about the current conditions in Iraq than Akrawi's experts did. A.R. 692.

Akrawi appealed to the Board. He also asked the Board to remand the case to the immigration judge so that the judge could consider new evidence. The Board denied this request and dismissed his appeal. A.R. 11. It first upheld the immigration judge's order finding Akrawi removable. The Board agreed that the Michigan court had convicted Akrawi of voluntary (not involuntary) manslaughter because his pretrial settlement offer listed that version of the offense. A.R. 4. It also agreed that Akrawi was removable because his manslaughter conviction was a "crime of violence" under 18 U.S.C. § 16(a) and so an "aggravated felony" under 8 U.S.C. § 1227(a)(2)(A)(iii). A.R. 4. The Board noted that Akrawi had presented no arguments why voluntary manslaughter fell outside the crime-of-violence definition in § 16(a) that remained valid after *Dimaya*. *Id.* Finding Akrawi removable as an aggravated felon, the Board saw no need to address whether this offense also involved "moral turpitude." A.R. 4–5 n.3.

The Board next held that Akrawi could not obtain withholding of removal because his manslaughter conviction was a "particularly serious crime" that barred this relief under 8 U.S.C. § 1231(b)(3)(B)(ii). A.R. 5–7. It reasoned that the immigration judge reasonably found that

6

Akrawi did not testify credibly about his crime. *Id.* It added that voluntary manslaughter qualified as a particularly serious crime even when considering the offense's elements alone. A.R. 6.

Turning to Akrawi's claim for deferral of removal under the Convention Against Torture, the Board concluded that the immigration judge fully considered the expert testimony and explained why the government's experts were more persuasive. A.R. 7–9. Under the views of the government's experts, moreover, Akrawi could not show that it was more likely than not that the Iraqi government would torture him or consent to his torture. A.R. 9.

The Board lastly rejected Akrawi's motion to remand. A.R. 11. It found his new evidence "generally cumulative" with the evidence that he had presented before. A.R. 10. The evidence thus did not show any significant changes in Iraq's conditions since the judge's decision. *Id.*

II

Akrawi now makes four arguments: (1) that he is not removable because his manslaughter offense is not an "aggravated felony" or a "crime involving moral turpitude" under 8 U.S.C. § 1227(a)(2)(A); (2) that he may seek withholding of removal because this offense is not a "particularly serious crime" under 8 U.S.C. § 1231(b)(3)(B)(ii); (3) that the Board wrongly held that he did not qualify for deferral of removal under the Convention Against Torture; and (4) that the Board should have remanded his case to the immigration judge to consider his new evidence.

Before we consider these arguments, we summarize our jurisdictional ground rules. We generally have jurisdiction to review a challenge to a "final order of removal[.]" 8 U.S.C. § 1252(a)(1). But Akrawi's order rested on his criminal convictions, so it triggers the jurisdiction-stripping provision in § 1252(a)(2)(C). That subparagraph deprives us of "jurisdiction to review any final order of removal against an alien who is removable by reason of having committed" an aggravated felony or certain crimes involving moral turpitude. *Id.* At the same time, Congress

granted an exception to this jurisdictional limit: we may review "constitutional claims or questions of law raised upon a petition for review[.]" *Id.* § 1252(a)(2)(D). This exception saves for our review not just purely legal questions (such as whether a statutory text has a certain meaning) but also "mixed question[s] of law and fact" (such as whether certain facts meet a governing legal test). *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1068–69 (2020). Given the combination of the jurisdictional limit and the exception, we lack jurisdiction to review any factual findings made by the Board or the immigration judge when issuing the final order of removal. *Id.* at 1073; *see also Patel v. Garland*, 142 S. Ct. 1614, 1623 (2022).

That said, § 1252(a)(2)(C)'s jurisdictional limit does not apply at all to claims under the regulations implementing the Convention Against Torture. *Nasrallah v. Barr*, 140 S. Ct. 1683, 1694 (2020). An order rejecting those claims is not part of the "final order of removal," so we may review Akrawi's factual challenges to the Board's denial of them. *See id.* at 1690–92.

### A. Removability

Akrawi first contends that he is not removable from the United States. The Attorney General may order the removal of lawfully admitted immigrants who fall into one of several "classes of deportable aliens," including those who have various criminal convictions. 8 U.S.C. § 1227(a). The immigration judge found that the government could remove Akrawi on two of these grounds: because he had been convicted of "two" "crimes" that "involv[e] moral turpitude," *id.* § 1227(a)(2)(A)(ii), and because he had been "convicted of an aggravated felony," *id.* § 1227(a)(2)(A)(iii). Akrawi's manslaughter conviction undergirded each ground. He argues that this offense was not an "aggravated felony" or a "crime involving moral turpitude."

We start with his aggravated-felony claim. Michigan's manslaughter statute provides: "Any person who shall commit the crime of manslaughter shall be guilty of a felony punishable

8

by imprisonment in the state prison, not more than 15 years or by fine of not more than 7,500 dollars, or both, at the discretion of the court." Mich. Comp. Laws § 750.321. According to Akrawi, the statute is not "divisible" into voluntary-manslaughter and involuntary-manslaughter parts under the "categorical approach" that courts use to decide whether an offense qualifies as an aggravated felony. *See Moncrieffe v. Holder*, 569 U.S. 184, 190 (2013). He next asserts that this categorical approach requires us to presume that his conviction rested on the statute's least-culpable conduct (involuntary manslaughter) and that involuntary manslaughter is not an aggravated felony. Petitioner's Br. 20–23. We are dubious of his "non-divisibility" claim. Although the Michigan statute does not separate this crime into its traditional "voluntary" and "involuntary" versions, the Michigan Supreme Court has long read it to include both kinds of manslaughter and has treated them as "distinct and separate offenses" with differing elements. *People v. Townes*, 218 N.W.2d 136, 140–41 (Mich. 1974); *see In re Nale Est.*, 803 N.W.2d 907, 910 (Mich. Ct. App. 2010) (per curiam). The Fifth Circuit thus has already treated this Michigan statute as divisible into voluntary and involuntary manslaughter under the modified categorical approach. *See United States v. Gonzalez*, 400 F. App'x 875, 876–77 (5th Cir. 2010) (per curiam). But we need not resolve the merits now because Akrawi's claim fails on forfeiture grounds.

It is not clear that Akrawi's brief in our court preserved his claim that his offense does not qualify as an "aggravated felony." He does not even identify the definition of "aggravated felony." The immigration laws define the phrase to include a long list of crimes, including a "crime of violence" under 18 U.S.C. § 16. *See* 8 U.S.C. § 1101(43)(F). Section 16, in turn, defines "crime of violence" to include both (a) "an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another" and (b) an "offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person

9

or property of another may be used in the course of committing the offense." 18 U.S.C. § 16(a)–(b). In *Dimaya*, the Supreme Court held that § 16(b)'s definition was unconstitutionally vague. 138 S. Ct. at 1213–16. So we must consider whether Akrawi's offense falls within § 16(a)'s "elements" clause. Akrawi's brief does not identify § 16(a)'s text or explain why his offense falls outside the text. Rather, he says in one sentence that involuntary manslaughter does not qualify as an "aggravated felony" because it lacks "the requisite intent as an element." Petitioner's Br. 21. This conclusory statement might be on to something because the Supreme Court recently held that a "reckless offense" cannot satisfy an "elements" clause like § 16(a)'s. *See Borden v. United States*, 141 S. Ct. 1817, 1822 (2021) (plurality opinion). Yet Akrawi does not cite *Borden* or identify the mens rea for involuntary manslaughter under Michigan law, "let alone make a coherent argument" about why this Michigan offense should fall outside § 16(a)'s language. *Mbonga v. Garland*, 18 F.4th 889, 898 (6th Cir. 2021).

In the end, though, we also need not resolve whether Akrawi preserved any claim in our court that his offense falls outside § 16(a) because he did not adequately raise that claim with the Board. We may review the Board's "final order of removal only if" "the alien has exhausted all administrative remedies available to the alien as of right[.]" 8 U.S.C. § 1252(d)(1). To exhaust, immigrants must assert their arguments with the Board in the manner that the Board's rules require. *See Singh v. Rosen*, 984 F.3d 1142, 1155 (6th Cir. 2021) (discussing *Ramani v. Ashcroft*, 378 F.3d 554, 560 (6th Cir. 2004)); *see also Woodford v. Ngo*, 548 U.S. 81, 90 (2006). The governing regulation requires immigrants to "specifically identify" in their notice of appeal "the findings of fact, the conclusions of law, or both, that are being challenged." 8 C.F.R § 1003.3(b). Immigrants also must cite "supporting authority" for their legal arguments. *Id.*

Given this regulation, we have repeatedly held that immigrants did not exhaust issues when they did not reasonably develop them with the Board. *See Singh*, 984 F.3d at 1155; *Cuevas-Nuno v. Barr*, 969 F.3d 331, 334–35 (6th Cir. 2020); *Hasan v. Ashcroft*, 397 F.3d 417, 419–20 (6th Cir. 2005). For example, we held that an immigrant did not exhaust one purported reason why her state offense did not qualify as an aggravated felony (about the state offense's affirmative defenses) when she gave different reasons for this conclusion to the Board (about the state offense's elements). *See Saleh v. Barr*, 795 F. App'x 410, 414–15 (6th Cir. 2019). Likewise, we held that an immigrant failed to exhaust the claim that his voluntary-manslaughter offense was not an aggravated felony because he challenged only the constitutionality of the aggravated-felony statute with the Board. *See Guenther v. Gonzales*, 127 F. App'x 786, 790–91 (6th Cir. 2005).

Akrawi's case follows the same pattern. Before the Board, he did not argue that the manslaughter statute was "non-divisible" or that it fell outside § 16(a)'s elements clause. His brief with the Board spent less than three pages on this topic, arguing primarily that the immigration judge had wrongly found as a fact that he pleaded guilty to voluntary (rather than involuntary) manslaughter. A.R. 604–06. It then asserted that his (alleged) involuntary-manslaughter offense did not qualify as a crime involving moral turpitude because a person could commit it through gross negligence. A.R. 606 (discussing *Matter of Tavdidishvili*, 27 I. & N. Dec. 142 (B.I.A. 2017)). He did not quote the aggravated-felony definition in 8 U.S.C. § 1101(43)(F) or the crime-of-violence definition in 18 U.S.C. § 16. Indeed, he cited § 16 only once in his introduction, which noted that *Dimaya* had found *§ 16(b)* unconstitutional. A.R. 604. The Board itself thus recognized that Akrawi made no "specific arguments" about *§ 16(a)*. A.R. 4. And it saw no "basis for disturbing" the immigration judge's ruling based on arguments that Akrawi did not make. *Id.*

11

Because he did not exhaust any argument about § 16(a) with the Board, he cannot now raise that type of argument in this court. *See Saleh*, 795 F. App'x at 414–15.

In response, Akrawi asserts that he exhausted this argument because his brief contained "generic" statements that his manslaughter offense did not qualify as an aggravated felony. Petitioner's Br. 24–25. To satisfy the exhaustion requirement, however, immigrants "must present the specific issue that they seek to raise" with the Board. *Singh*, 984 F.3d at 1155. Akrawi's general statement failed to "specifically identify" the § 16(a) argument that he now seeks to assert or cite the "supporting authority" underlying this argument. 8 C.F.R. § 1003.3(b); *see also Singh*, 984 F.3d at 1155. Just as we would hold that a brief's conclusory statements do not suffice to preserve an argument in our court, *see Mbonga*, 18 F.4th at 898, so too the Board could reasonably hold that the same conclusory statements do not suffice to preserve an argument with that body, *cf. Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 751 (6th Cir. 2019).

This conclusion leaves two loose ends. The first loose end: We have traditionally treated this exhaustion requirement as jurisdictional. *See, e.g.*, *Saleh*, 795 F. App'x at 414. The Supreme Court recently granted review of a case that will consider whether we have properly done so. *See Santos-Zacaria v. Garland*, 143 S. Ct. 82 (2022). Yet the government raised the exhaustion issue in this case, so the Court's conclusion about the nature of the exhaustion mandate will not affect the outcome. We typically must enforce claims-processing rules when a party has properly invoked them even if they are not jurisdictional. *See Nutraceutical Corp. v. Lambert*, 139 S. Ct. 710, 714–15 (2019); *see also Saleh*, 795 F. App'x at 424 (Murphy, J., concurring).

The second loose end: Akrawi separately argues that his manslaughter offense was not a crime involving moral turpitude. But the Board declined to reach this issue. A.R. 4–5 n.3. Because the Board did not consider it, we may not either. *See Mbonga*, 18 F.4th at 893 (citing *INS*

12

*v. Orlando Ventura*, 537 U.S. 12, 16–17 (2002) (per curiam)). And because our aggravated-felony conclusion made Akrawi removable, this issue does not matter to the outcome anyway. *See Rayon-Aquino v. Wilkinson*, 847 F. App'x 301, 304 (6th Cir. 2021).

### B. Withholding of Removal

Even if removable, Akrawi next argues, he could qualify for withholding of removal under 8 U.S.C. § 1231(b)(3)(A). Under that statute, immigrants may seek to prevent their removal to specific countries if their "life or freedom would be threatened" in those countries because of various protected traits. *Id.* Yet an immigrant cannot seek this relief if the "Attorney General decides that" the immigrant, after "having been convicted by a final judgment of a particularly serious crime[,] is a danger to the community of the United States." *Id.* § 1231(b)(3)(B)(ii). Akrawi challenges the Board's holding that his manslaughter offense was a "particularly serious crime" that rendered him ineligible for withholding of removal.

Although the withholding-of-removal statute does not define the phrase "particularly serious crime," it does offer guidance on the topic. *See Saleh v. Sessions*, 756 F. App'x 502, 507 (6th Cir. 2018). The statute states that an "aggravated felony" that results in a sentence "of at least 5 years" "shall be considered" a particularly serious crime. 8 U.S.C. § 1231(b)(3)(B). It then provides that "the Attorney General" has the authority to decide that other crimes qualify as "particularly serious crimes" "notwithstanding the length of sentence imposed" for the crimes. *Id.*

Exercising the Attorney General's authority, the Board has listed "factors" to help determine whether an offense qualifies as a "particularly serious crime" on a case-by-case basis. *Saleh*, 756 F. App'x at 507–08 (discussing *Matter of N-A-M-*, 24 I. & N. Dec. 336, 342 (B.I.A. 2007)). The Board sometimes relies on an offense's legal elements alone. *See N-A-M-*, 24 I. & N. Dec. at 342. For most crimes, however, it considers "the actual circumstances" together with the

elements. *Id.* at 344. To identify a crime's circumstances, the Board looks to "all reliable information," including conviction records and arrest warrants. *Id.* at 343. It has suggested that crimes against people more likely qualify as "particularly serious crimes" than crimes against property. *Id.* And it presumes that an immigrant who commits a "particularly serious crime" represents a "danger to the community." *See id.* at 342; *Abdulahad v. Barr*, 838 F. App'x 126, 133 (6th Cir. 2020).

We have described the question whether an offense qualifies as a "particularly serious crime" as a mixed question that "involve[s] the application of law to fact." *Hamama v. INS*, 78 F.3d 233, 239 (6th Cir. 1996). Thus, despite the limits on our jurisdiction in § 1252(a)(2)(C), we would have jurisdiction to review the Board's ultimate conclusion that Akrawi's manslaughter offense was a "particularly serious crime." *See Guerrero-Lasprilla*, 140 S. Ct. at 1068–69.

Here, however, Akrawi does not dispute that he would have committed a "particularly serious crime" under the Board's finding that he pleaded guilty to *voluntary* manslaughter. He instead argues that the Board wrongly rejected his argument that he instead pleaded guilty to *involuntary* manslaughter. Yet, as we have said in related contexts, whether Akrawi pleaded guilty to involuntary or voluntary manslaughter represents a purely factual question. *See United States v. Walls*, 781 F. App'x 398, 400 (6th Cir. 2019); *United States v. Sanders*, 470 F.3d 616, 618 (6th Cir. 2006). And because Akrawi raises only a factual claim about why he did not commit a particularly serious crime, we lack jurisdiction to review his argument under § 1252(a)(2)(C). *See Guerrero-Lasprilla*, 140 S. Ct. at 1073; *Abdulahad*, 838 F. App'x at 131–32.

We end with a disclaimer. Apart from statutory withholding of removal, immigrants may also seek withholding of removal under regulations implementing the Convention Against Torture. *See* 8 C.F.R. § 1208.16(c)(2). These regulations, though, also bar withholding if an immigrant has

been convicted of a particularly serious crime. *See id.* § 1208.16(d)(2); *Luambano v. Holder*, 565 F. App'x 410, 412 (6th Cir. 2014). Section 1252(a)(2)(C)'s jurisdictional bar presumably would not prohibit our review of any factual findings undergirding a conclusion that an immigrant committed a particularly serious crime and so could not seek withholding of removal under the Convention Against Torture (rather than the statute). *See Nasrallah*, 140 S. Ct. at 1694. But Akrawi did not argue this jurisdictional point, so we need not consider the issue here.

## C. Deferral of Removal

That said, Akrawi did argue that we could review his factual challenges to the Board's rejection of his claim for *deferral* of removal under the Convention Against Torture. Eligibility for deferral of removal (like eligibility for *withholding* of removal under the Convention Against Torture) requires an immigrant to prove that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. §§ 1208.16(c)(2), 1208.17(a). The regulations define "torture" to contain a state-action component: the required "severe pain or suffering" must be "by" or "with the consent or acquiescence of" a public official. *Id.* § 1208.18(a)(1). Immigrants may seek deferral (a more temporary form of relief) if they cannot seek withholding because, for example, they have committed a particularly serious crime. *See id.* §§ 1208.16(d)(2), 1208.17(a); *Wanjiru v. Holder*, 705 F.3d 258, 263–64 (7th Cir. 2013).

Akrawi told the immigration judge that he would face torture in Iraq because "he is an Americanized Chaldean Christian." A.R. 691. But the judge found that Akrawi failed to satisfy his burden to prove this claim. The judge's holding rested on the finding that the government's experts were more credible about the conditions in Iraq than Akrawi's competing experts. A.R. 692. And the Board held that this credibility finding was not clearly erroneous. A.R. 8.

15

We agree. Akrawi's arguments cannot overcome the "highly deferential" standard of review that we apply to the immigration judge's resolution of this battle of experts. *Nasrallah*, 140 S. Ct. at 1692. Akrawi must do more than "identify evidence that '*supports*'" his preferred finding that he would suffer torture in Iraq. *Shafo v. Wilkinson*, 844 F. App'x 791, 796 (6th Cir. 2021) (citation omitted). He must show that the entire record "*compels*" the finding. *Id.* (citation omitted); *cf.* 8 U.S.C. § 1252(b)(4)(B). Yet, as we have observed in many cases involving the deportation of Chaldean Christians to Iraq, evidence about that country's conditions is decidedly "mixed." *Akrawi*, 2022 WL 3681260, at *4; *see also, e.g.*, *Rofa v. Garland*, 2022 WL 17491839, at *4–5 (6th Cir. Dec. 8, 2022); *Yousif v. Garland*, 53 F.4th 928, 933–35 (6th Cir. 2022); *Khalasawi v. Garland*, 2022 WL 2679048, at *2 (6th Cir. July 12, 2022); *Suleiman v. Garland*, 849 F. App'x 587, 589 (6th Cir. 2021); *Kanona v. Garland*, 860 F. App'x 371, 372–73 (6th Cir. 2021); *Solaka v. Wilkinson*, 844 F. App'x 797, 799 (6th Cir. 2021); *Shafo*, 844 F. App'x at 796; *Abdulahad*, 838 F. App'x at 136; *Al-Koorwi v. Barr*, 837 F. App'x 323, 328–30 (6th Cir. 2020). That type of conflicting record forecloses our ability to grant relief. *See Akrawi*, 2022 WL 3681260, at *5. Indeed, we reached this conclusion when rejecting the same argument by Akrawi's uncle who had attempted to assassinate Saddam Hussein. *See id.*

The record in Akrawi's case contains the same evidentiary conflict. On the one hand, his experts detailed many risks to Chaldean Christians from ongoing terrorism and sectarian conflict, as well as from the Iraqi government's mistreatment of returning Americans. *See, e.g.*, A.R. 1059–1117. On the other hand, the government's experts presented evidence cutting the other way. Many Christians, for example, have safely returned to the country. A.R. 1510; *see Shafo*, 844 F. App'x at 796. The Iraqi government has also cracked down on private abuses and has professionalized its security forces to deter its own violence. A.R. 1570; *see Al-Koorwi*, 837

16

F. App'x at 329. In the face of this evidentiary dispute, we cannot find that the record compels the conclusion that Akrawi would more likely than not suffer torture. *See Yousif*, 53 F.4th at 934–35; *Shafo*, 844 F. App'x at 796.

That may be so, Akrawi responds, but the Board also committed three legal errors. He first notes that the government's briefing wrongly suggested that he must identify a specific person who would torture him. He is correct that an immigrant can qualify for relief without identifying a specific perpetrator. *Cf.* 8 C.F.R. § 1208.16(c)(3)(iii)–(iv). But he points to nothing in the Board's decision that required him to do so. The Board instead correctly recognized that Akrawi must establish only a "threat of torture" that is "particularized" to him. A.R. 8 (quoting *Almuhtaseb v. Gonzales*, 453 F.3d 743, 751 (6th Cir. 2006)); *see Suleiman*, 849 F. App'x at 589; *Marqus v. Barr*, 968 F.3d 583, 587 (6th Cir. 2020). And the Board could reasonably conclude that Akrawi did not establish this particularized threat by pointing only to his characteristics as a westernized Chaldean Christian with a criminal record. *See, e.g.*, *Solaka*, 844 F. App'x at 799.

Akrawi next argues that the government's experts used a wrong legal standard. They analyzed whether an "appreciable risk" of torture exists, but the regulation asks whether a more-likely-than-not risk of torture exists. *Compare* A.R. 1508, *with* 8 C.F.R. § 1208.17(a). Yet only one of the government's experts used this phrase and only as a high-level summary of more detailed testimony. *See* A.R. 1508–13. Nothing suggests that the expert believed that Akrawi had to meet a standard higher than the regulation's more-likely-than-not burden of proof. Indeed, we have also used the phrase "appreciable risk" in the same colloquial sense. *See Al-Koorwi*, 837 F. App'x at 329; *see also Khalasawi*, 2022 WL 2679048, at *2.

Akrawi lastly suggests that the Board reviewed the wrong immigration-judge opinion. The opinion that it reviewed (issued on November 27, 2018) addressed Akrawi's claims. A.R. 686.

But another unsigned opinion (dated December 17, 2018) made its way into Akrawi's administrative record. A.R. 668–81. Akrawi objects that the Board should have reviewed this later opinion, which allegedly committed legal errors. But apart from its caption, this opinion had nothing to do with Akrawi. It concerned a "thirty-five year old Chaldean Catholic" who was referred to in passing only by a first name ("Moaied") and who entered the United States while Akrawi was serving his sentence for manslaughter. A.R. 670, 672. And even Akrawi's notice of appeal to the Board identified the correct (November) opinion as the one that the Board should review. A.R. 664. We see no error in its refusal to consider an opinion that was placed into Akrawi's record by mistake.

### D. Motion to Remand

At the least, Akrawi contends, the Board should have granted his motion to remand to allow the immigration judge to consider the hundreds of pages of new evidence that he submitted to the Board. The Board typically subjects a motion to remand to the same standards that apply to a motion to reopen the removal proceedings. *See Liu v. Holder*, 560 F.3d 485, 489 n.4 (6th Cir. 2009); 8 U.S.C. § 1229a(c)(7)(A)–(B). The Board may not grant this relief "unless it appears to the Board that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing[.]" 8 C.F.R. § 1003.2(c)(1); *see Yousif*, 53 F.4th at 936. Evidence is not "material" unless it would likely change the outcome of the proceedings. *See Jado v. Wilkinson*, 847 F. App'x 278, 284 (6th Cir. 2021). Akrawi thus must satisfy the "heavy burden" of proving that his new evidence establishes that the Iraqi government would likely torture him in a way that his old evidence did not. *Id.* (citation omitted). And we review the Board's conclusion that he did not meet this burden for an abuse of discretion. *See id.*

18

In a string of recent cases, we have repeatedly rejected the claims by Chaldean Christians that their new evidence about the most current conditions in Iraq established a right to a remand. *See Yousif*, 53 F.4th at 936–38; *Akrawi*, 2022 WL 3681260, at *7–8; *Jado*, 847 F. App'x at 284–89; *Abdulahad*, 838 F. App'x at 137; *see also Khalasawi*, 2022 WL 2679048, at *2. These cases dictate the outcome here. Akrawi submitted updated expert testimony, updated reports on Iraq, new media reports on protests and violence against Christians and Americans in the country, and unpublished decisions from the Board and immigration judge. *See* A.R. 31–35. Yet, as these other cases explained, the Board could reasonably find Akrawi's new evidence "cumulative" of his already-submitted evidence because it showed the same types of country conditions that fell short of establishing that Chaldean Christians would likely be tortured in Iraq. A.R. 10; *see, e.g.*, *Yousif*, 53 F.4th at 936–37; *Akrawi*, 2022 WL 3681260, at *8.

Akrawi raises two objections to our conclusion without attempting to distinguish any of our precedent. He first objects that his evidence was not cumulative because it identified "400 civilian deaths and more than 20,000 injuries in Iraq" since his immigration hearing. Petitioner's Br. 36–37. But he fails to explain why these (tragic) incidents establish that the Board abused its discretion in finding no change from the "preexisting volatility and ongoing violent conditions" in Iraq. *Jado*, 847 F. App'x at 286. In addition, he fails to explain why these general statistics establish that the Board abused its discretion in finding that Akrawi had not shown a "particularized threat of torture" to him personally. *Yousif*, 53 F.4th at 937 (citation omitted).

Akrawi next objects that the Board's conclusion conflicted with its (or the immigration judge's) ruling in two other unpublished opinions. *See* A.R. 583–95. Yet the Board reasonably recognized that these unpublished decisions have no precedential value and so could not support a remand. A.R. 10–11 & n.5; *see Yousif*, 53 F.4th at 938. Besides, Akrawi must at least show that

the decisions conflict with the Board's ruling in his case for us to describe the Board's actions as "arbitrary." *Yousif*, 53 F.4th at 938. Yet the reason for the "different outcomes" across these cases is "readily apparent": they involved different facts. *Id.* As one example, in the two cases that Akrawi cites, the immigrant's personal traits fit the profile of an ISIS supporter whom Iraqi government officials may well seek to harm. A.R. 588–89, 594. The immigration judge and Board did not make this finding about Akrawi. A.R. 9, 692. In sum, the Board did not abuse its discretion in refusing to treat different cases the same. *See Yousif*, 53 F.4th at 938.

\* \* \*

We dismiss Akrawi's petition for review in part and deny it in part.